**AMERICAN LIBRARIES ASSOCIATION;**
**et al., Plaintiffs,**

**v.**

**George PATAKI, et al., Defendants.**

**No. 97 Civ. 0222 (LAP).**

United States District Court,
S.D. New York.

June 20, 1997.

Latham & Watkins, New York City by Michael K. Hertz, Anat Hakim; American

Civil Liberties Union New York City by Christopher A. Hansen, Ann Beeson; New York Civil Liberties Union, New York City by Arthur N. Eisenberg; Sonnenschein Nath & Rosenthal, New York City by Michael A. Bamberger, for Plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York, New York City by Jeanne Lahiff, James M. Hershler, for defendants.

## *OPINION*

PRESKA, District Judge:

The Internet may well be the premier technological innovation of the present age. Judges and legislators faced with adapting existing legal standards to the novel environment of cyberspace struggle with terms and concepts that the average American five-year-old tosses about with breezy familiarity.[1] Not surprisingly, much of the legal analysis of Internet-related issues has focused on seeking a familiar analogy for the unfamiliar. Commentators reporting on the recent oral argument before the Supreme Court of the United States, which is considering a First Amendment challenge to the Communications Decency Act, noted that the Justices seemed bent on finding the appropriate analogy which would tie the Internet to some existing line of First Amendment jurisprudence: is the Internet more like a television? a radio? a newspaper? a 900–line? a village green? *See, e.g.,* Linda Greenhouse, *What Level of Protection for Internet Speech? High Court Weighs Decency–Act Case,* N.Y. Times, March 24, 1997, at C5; *see also Denver Area Educ. Telecommunications Consortium v. Federal Communics. Comm'n,* —— U.S. ——, —— – ——, 116 S.Ct. 2374, 2419–21, 135 L.Ed.2d 888 (1996) (Thomas, J., concurring in the judgment and dissenting in part) (criticizing the majority for declining to determine whether cable television is more closely analogous, for pur-

poses of First Amendment analysis, to a print medium or a broadcast medium). This case, too, depends on the appropriate analogy. I find, as described more fully below, that the Internet is analogous to a highway or railroad. This determination means that the phrase "information superhighway" is more than a mere buzzword; it has legal significance, because the similarity between the Internet and more traditional instruments of interstate commerce leads to analysis under the Commerce Clause.

## *BACKGROUND*

The plaintiffs in the present case filed this action challenging New York Penal Law § 235.21(3) (the "Act" or the "New York Act"), seeking declaratory and injunctive relief. Plaintiffs contend that the Act is unconstitutional both because it unduly burdens free speech in violation of the First Amendment and because it unduly burdens interstate commerce in violation of the Commerce Clause. Plaintiffs moved for a preliminary injunction enjoining enforcement of the Act; defendants opposed the motion. A factual hearing was held from April 3 to April 7, 1997 and oral argument conducted on April 22, 1997. For the reasons that follow, the motion for a preliminary injunction is granted.

### I. *Parties to the Action*

Plaintiffs in the present action represent a spectrum of individuals and organizations who use the Internet to communicate, disseminate, display, and access a broad range of communications. All of the plaintiffs communicate online both within and outside the State of New York, and each plaintiff's communications are accessible from within and outside New York. Plaintiffs include:

● American Library Association, Freedom to Read Foundation, Inc., New York Library Association, and Westchester Library System are organizations representing the inter-

---

1. I recall in this respect a particularly confusing item of testimony elicited at the evidentiary hearing. Ms. Kovacs, plaintiffs' expert witness with respect to the Internet, testified that on one occasion while she was in a MUD (a Multi–User Dungeon), a malefactor sicced his "virtual dog" on her because she had trespassed on his do-

main. Fortunately, the other inhabitants of the MUD came to her rescue, vehemently protesting the unfriendliness of the virtual canine attack. Relieved as I was that the story had a happy ending, I must admit that ·it afforded me a window into an entirely unknown world. (4/4/97 Tr., p. 95).

ests of libraries. Libraries serve as both access and content providers on the Internet, providing their patrons with facilities to access the Internet. Libraries also post their card catalogues, information about upcoming events and online versions of text or art from their collections, as well as sponsoring chat rooms.

● American Booksellers Foundation For Free Expression ("ABFFE") is a national association of general interest and specialized bookstores formed to protect free expression rights. ABFFE has many members who use the Internet and electronic communications to obtain from publishers information and excerpts, some of which may contain sexually explicit passages.

● Association of American Publishers ("AAP") is a national association of publishers of general books, textbooks, and educational materials. AAP has many members who actively use and provide content on the Internet, both creating and posting electronic products and using the Internet as a communication and promotional tool for their print publishing activities.

● BiblioBytes is a private, profit-seeking enterprise that uses the World Wide Web (the "Web") to provide information about and to sell electronic books. BiblioBytes offers titles in a variety of genres, including romance, erotica, classics, adventure, and horror.

● Magazine Publishers of America ("MPA") is a national association of publishers of consumer magazines. MPA's members publish magazines in print form, but are also beginning to offer publications in electronic formats available to the public on the Internet or through online service providers.

● Interactive Digital Software Association ("IDSA") is a non-profit trade association of United States publishers of entertainment software. IDSA has many members who both sell their software in retail outlets and make their entertainment software available to the public on the Internet for demonstration, purchase, and play.

● Public Access Networks Corporation ("Panix") is an Internet service provider serving subscribers located in the New York area. Panix also hosts various organizational Web pages, assists its subscribers in creating individual Web pages, and hosts online discussion groups and chat rooms.

● ECHO is a for-profit Internet service provider that offers a "virtual salon" to Internet users. ECHO and its subscribers provide content on the Internet through the posting of Web sites, including personal home pages, and through over 50 discussion groups oriented to subscribers' interests.

● New York City Net ("NYC Net") is a for-profit Internet service provider catering primarily to lesbians and gay men in the New York area. NYC Net provides access services and content specifically oriented to gay and lesbian interests, including a large number of online discussion groups and chat rooms.

● Art on the Net is a non-profit organization with an international artist site ("art. net") on the Web. Art on the Net assists over 110 artists from all over the world in maintaining online studios.

● Peacefire is an organization whose membership consists primarily of minors. It was formed to protect the rights of citizens under the age of 18 to use the Internet. Peacefire's members use the Internet to communicate and access a wide variety of information. Peacefire's founder points out in his Declaration that Internet access is particularly important to those members who are too young to drive and might otherwise be unable to view materials from museums, libraries, and other institutions to which their families are unwilling to transport them. (*See* Declaration of Bennett Haselton, sworn to on March 12, 1997, at p. 4).

● American Civil Liberties Union ("ACLU") is a national civil rights organization. The ACLU maintains a Web site on which it posts civil liberties information and resources, including material about arts censorship, obscenity laws, discrimination against lesbians and gays, and reproductive choice. In addition, the ACLU hosts unmoderated online discussion groups that allow citizens to discuss and debate a variety of civil liberties issues.

■ Defendants in this case are the Governor and the Attorney General of New York. Defendants have raised the question of whether an injunction against those parties would also bind the sixty-two District Attorneys in New York who would actually be mounting prosecutions against alleged violators of the Act. Fed.R.Civ.P. 65(d) provides:

Every order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Thus, parties such as the local District Attorneys who "participate" in the enjoined activities with defendants and who have actual notice of the injunction would be bound. *See American Booksellers v. Webb,* 590 F.Supp. 677, 693–94 (N.D.Ga.1984) (holding that an injunction against the Attorney General also binds state law enforcement officials who might seek to enforce the challenged Act); *see also United Transportation Union v. Long Island RR Co.,* 634 F.2d 19, 21 (2d Cir.1980) (binding non-party Attorney General to the terms of an injunction against the defendants because Attorney General "undoubtedly had knowledge of the instant action and could have participated therein had he chosen to do so"), *rev'd on other grounds,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). Thus, a preliminary injunction would effectively bar enforcement of the Act whether the prosecution happened to be brought directly by the Attorney General's office or by one of the individual District Attorneys.

II. *The Challenged Statute*

The Act in question amended N.Y. Penal Law § 235.21 by adding a new subdivision. The amendment makes it a crime for an individual:

Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, [to] intentionally use[ ] any computer communication system allowing the input, output, examination or transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor.

Violation of the Act is a Class E felony, punishable by one to four years of incarceration. The Act applies to both commercial and non-commercial disseminations of material.

Section 235.20(6) defines "harmful to minors" as:

that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:

(a) Considered as a whole, appeals to the prurient interest in sex of minors; and

(b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(c) Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.

N.Y. Penal Law § 235.20(6).

The statute provides six defenses to liability. First, Section 235.15(1) provides the following affirmative defense to prosecution under § 235.21(3):

In any prosecution for obscenity, or disseminating indecent material to minors in the second degree in violation of subdivision three of section 235.21 of this article, it is an affirmative defense that the persons to whom the allegedly obscene or indecent material was disseminated, or the audience to an allegedly obscene performance, consisted of persons or institutions having scientific, educational, governmental or other similar justification for possessing, disseminating or viewing the same.

The statute further provides four regular defenses to prosecution:

(a) The defendant made a reasonable effort to ascertain the true age of the minor and was unable to do so as a result of the actions taken by the minor; or

(b) The defendant has taken, in good faith, reasonable, effective and appropriate actions under the circumstances to restrict or prevent access by minors to materials

specified in such subdivision, which may involve any appropriate measures to restrict minors from access to such communications, including any method which is feasible under available technology; or

(c) The defendant has restricted access to such materials by requiring use of a verified credit card, debit account, adult access code or adult personal identification number; or

(d) The defendant has in good faith established a mechanism such that the labelling, segregation or other mechanism enables such material to be automatically blocked or screened by software or other capabilities reasonably available to responsible adults wishing to effect such blocking or screening and the defendant has not otherwise solicited minors not subject to such screening or blocking capabilities to access that material or circumvent any such screening or blocking.

N.Y. Penal Law § 235.23(3). And, finally, Section 235.24 provides that no individual shall be held liable:

[S]olely for providing access or connection to or from a facility, system, or network not under that person's control, including transmission, downloading, intermediate storage, access software, or other related capabilities that are incidental to providing such access or connection that do not include the creation of the content of the communication.

N.Y. Penal Law § 235.24. Exceptions to this defense for conspirators or co-owners and an additional employer liability defense are set forth in Section 235.24(1)(a)–(b) and (2).

III.   The *Internet* [2]

The Internet is a decentralized, global communications medium linking people, institutions, corporations, and governments all across the world. *ACLU v. Reno,* 929 F.Supp. 824 (E.D.Pa.), *prob. juris. noted,* —— U.S. ——, 117 S.Ct. 554, 136 L.Ed.2d 436 (1996), *argued,* March 19, 1997; *Shea v. Reno,* 930 F.Supp. 916 (S.D.N.Y.1996), *argued,* March 19, 1997. The nature of the Internet makes it very difficult, if not impossible, to determine its size at any given moment. Undoubtedly, however, the Internet has experienced extraordinary growth in recent years. In 1981, fewer than 300 computers were linked to the Internet; in 1989, the number stood at fewer than 90,000 computers. By 1993, over 1,000,000 computers were linked. Today, over 9,400,000 host computers worldwide, 60% of them located in the United States, are linked to the Internet. This count does not include users who access the Internet via modem link-up from their personal computers. As many as 40 million people worldwide currently enjoy access to the Internet's rich variety of resources, and that number is expected to grow to 200 million by the year 1999.

The Internet is a network of networks—a decentralized, self-maintaining series of redundant links among computers and computer networks, capable of rapidly transmitting communications without direct human involvement or control. No organization or entity controls the Internet; in fact, the chaotic, random structure of the Internet precludes any exercise of such control.

The information available on the Internet is "as diverse as human thought," *ACLU,* 929 F.Supp. at 842. Every facet of art, literature, music, news, and debate is represented. There can be no question that the overwhelming variety of available information includes some sexually explicit materials. Sexually-oriented content is, however, not "the primary type of content on this new medium." *Id.*

Individuals obtain access to the Internet via a number of avenues. Students and faculty often obtain access via their educational institutions; similarly, some corporations provide their employees with direct or modem access to the Internet. Individuals in some communities can access the Internet via a community network or a local library that provides direct or modem access to library patrons. Storefront "computer coffee shops" offer another option, serving up access to cyberspace accompanied by coffee

---

**2.** Where information in this subsection is not cited to *ACLU* or *Shea,* it was derived from the parties' Joint Stipulation of Facts.

and snacks for a small hourly fee. "Internet service providers" typically offer modem telephone access to a computer or computer network linked to the Internet. Many such providers—including plaintiffs Panix, Echo, and NYC NET—are commercial entities offering Internet access for a monthly or hourly fee. Another common way for individuals to access the Internet is through one of the major national commercial "online services" such as America Online, Compuserve, the Microsoft Network, or Prodigy, which collectively service almost twelve million individual subscribers across the United States. These online services offer nationwide computer networks (allowing subscribers to dial in via a local telephone number) and provide both proprietary content and links to the even more extensive resources of the Internet for a monthly or hourly fee. Finally, local dial-in computer services, called "bulletin board systems" or "BBSs" provide Internet access via direct or indirect links.

The Internet permits a user to communicate pictures and text in several ways including:

(1) one-to-one messaging (such as "email");

(2) one-to-many messaging (such as "listserv" or "mail exploder");

(3) distributed message databases (such as "USENET newsgroups");

(4) real time remote computer utilization (such as "Internet Relay Chat");

(5) real time remote computer utilization (such as "telnet"); and

(6) remote information retrieval (such as "ftp," "gopher," and the Web).

In addition to transmitting pictures and text, many of these communication methods can be used to transmit data, computer programs, sound, and moving video images.

Most users of the Internet are provided with a username, password and e-mail address that allow them to sign on to the Internet and communicate with other users. Many usernames are pseudonyms, known as "handles," which provide users with a distinct online identity and preserve anonymity. For example, Ms. Kovacs testified that she uses the handle "Harriet Vane" when communicating with fellow mystery aficionados in the "Dorothy L" listserv and the nom de cyber "Mrs. Archangel" when she's just "goofing off" on the Internet. (4/4/97 Tr., at 58). The username and e-mail address are the only indicators of a user's identity; generally speaking, neither datum discloses a party's age or geographic location.

E-mail is the simplest method of Internet communication. E-mail allows an online user to address and transmit an electronic message to one or more people. The *ACLU* court noted that e-mail is "comparable in principle to sending a first class letter." *ACLU*, 929 F.Supp. at 834. The analogy is not a perfect one, however, for two reasons. First, the sender directs his message to a logical rather than geographic address, and therefore need not know the location of his correspondent in real space. Second, most programs provide for a "reply" option which enables the recipient to respond to the sender's message simply by clicking on a button; the recipient will therefore not even need to type in the sender's e-mail address. A further distinction concerns the level of security that protects a communication. While first-class letters are sealed, e-mail communications are more easily intercepted. Concerns about the relatively easy accessibility of e-mail communications have led bar associations in some states to require that lawyers encrypt sensitive e-mail messages in order to protect client confidentiality. *See* Carey Ramos & Curtis Carmack, *Beware of Cyberspace Marauders: Internet Security Addressed,* N.Y.L.J., February 24, 1997, at S1.

The Internet also includes a wide variety of online discussion fora that allow groups of users to discuss and debate subjects of interest. The three most common means by which such discussion groups come together are through mail exploders, USENET newsgroups, and chat rooms.

Mail exploders, also known as "listservs," allow online users to subscribe to automated mailing lists that disseminate information on particular subjects. Subscribers send an e-mail message to the "list," and the mail exploder automatically and simultaneously sends the message to all of the other subscribers on the list. Users of mailing lists

can add or delete their names from the list automatically, without any direct human involvement. *Id.* at 834; *Shea,* 930 F.Supp. at 927.

USENET newsgroups are a very popular set of discussion groups arranged according to subject matter and automatically disseminated "using ad hoc peer to peer connections between approximately 200,000 computers . . . around the world." *ACLU,* 929 F.Supp. at 834–35. Users may read or send messages to newsgroups without any prior subscription, and there is no way for a speaker who posts an article to a newsgroup to know who is reading the message. *Id.; Shea,* 930 F.Supp. at 927–28. Currently, more than 15,000 different subjects are represented in USENET newsgroups, and over 100,000 new messages are posted to these groups every day. *ACLU,* 929 F.Supp. at 835.

Chat rooms allow online discussion in real time. Users are able to engage in simultaneous conversations with one or many "occupants" by typing in messages and reading the messages typed by others participating in the chat; the *ACLU* court analogized this Internet application to a telephone party line. *ACLU,* 929 F.Supp. at 835; *Shea,* 930 F.Supp. at 928. There are thousands of different chat rooms available "in which collectively tens of thousands of users are engaging in conversations on a huge range of subjects." *ACLU,* 929 F.Supp. at 835.

Finally, perhaps the most well-known method of communicating information online is the Web; many laypeople erroneously believe that the Internet is co-extensive with the Web. The Web is really a publishing forum; it is comprised of millions of separate "Web sites" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create a Web page, view Web pages posted by others, and then read text, look at images and video, and listen to sounds posted at these sites. Many large corporations, banks, brokerage houses, newspapers and magazines provide online editions of their reports and publications or operate independent Web sites. Government agencies and even courts use the Web to disseminate information to the public. At the same time, many individual users and small community organizations have established individual "home pages" on the Web that provide information to any interested person who "surfs by."

Although information on the Web is contained on innumerable Web sites located on individual computers around the world, each of these Web sites and computers is connected to the Internet by means of protocols that permit the information to become part of a single body of knowledge accessible by all Web visitors. *ACLU,* 929 F.Supp. at 836, 837. To gain access to the resources of the Web, an individual employs a "browser." A browser is software, such as Netscape Navigator, Mosaic, or Internet Explorer, that allows the user to display, print, and download documents that are formatted in the standard Web formatting language. *Shea,* 930 F.Supp. at 929.

There are a number of different ways that Internet users can browse or search for content on the Web. First, every document on the Web has an address that allows users to find and retrieve it, and a user can simply type in the address and go directly to that site. Again, however, the address is a logical rather than geographic concept, and the user will not necessarily know where the site is located in real space. Additionally, a user who wants to conduct a generalized search or wants to reach a particular site but does not know the address, can use a "search engine," which is available free of charge to help users navigate the Web. *ACLU,* 929 F.Supp. at 837. The user simply types a word or string of words as a search request, and the search engine provides a list of sites that match the search string. *Id.*

Finally, online users may "surf" the Web by "linking" from one Web page to another. Almost all Web documents contain "links," segments of text or images that refer to another Web document. *Id.* at 836. When the user clicks on the link, the linked document is automatically displayed, wherever in the world it is stored. *Id.* For example, the American Library Association ("ALA") home page contains several links. Some of these links are to other Web pages or documents within the ALA site, including documents

entitled "Libraries Online," "Library Promotional Events," and the "ALA Bookstore." Other links from the ALA home page connect the user to sites maintained by other organizations or individuals and stored on other computers around the world. The ALA Web site, for example, provides links to the American Association of Law Libraries, the Art Libraries Society of North America, and the Medical Library Association. "These links from one computer to another, from one document to another across the Internet, are what unify the Web into a single body of knowledge, and what makes the Web unique." *Id.* at 836–37.

Regardless of the aspect of the Internet they are using, Internet users have no way to determine the characteristics of their audience that are salient under the New York Act—age and geographic location. In fact, in online communications through newsgroups, mailing lists, chat rooms, and the Web, the user has no way to determine with certainty that any particular person has accessed the user's speech. "Once a provider posts content on the Internet, it is available to all other Internet users worldwide." *Id.* at 844. A speaker thus has no way of knowing the location of the recipient of his or her communication. As the poet said, "I shot an arrow into the air; it fell to the earth I know not where."

■ This highly simplified description of the Internet is not intended to minimize its marvels. While no one should lose sight of the inventiveness that has made this complex of resources available to just about anyone, the innovativeness of the technology does not preclude the application of traditional legal principles—provided that those principles are adaptable to cyberspace. In the present case, as discussed more fully below, the Internet fits easily within the parameters of interests traditionally protected by the Commerce Clause. The New York Act represents an unconstitutional intrusion into interstate commerce; plaintiffs are therefore entitled to the preliminary injunction that they seek.

**DISCUSSION**

I. *Standard Applicable to a Preliminary Injunction*

■ To demonstrate their entitlement to a preliminary injunction, plaintiffs must show (a) that they will suffer irreparable harm and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation [3] and a balance of hardships tipping decidedly in the plaintiffs' favor. *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991); *Streetwatch v. National R.R. Passenger Corp.*, 875 F.Supp. 1055, 1058 (S.D.N.Y.1995). In the present case, as discussed more fully below, plaintiffs have amply demonstrated the likelihood of their successful prosecution of their claim that the Act violates the Commerce Clause because it seeks to regulate communications occurring wholly outside New York, imposes a burden on interstate commerce that is disproportionate to the local benefits it is likely to engender, and subjects plaintiffs, as well as other Internet users, to inconsistent state obligations. *See Healy v. Beer Institute*, 491 U.S. 324, 332, 109 S.Ct. 2491, 2497, 105 L.Ed.2d 275 (1989); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945).

■ Plaintiffs have also shown that they face irreparable injury in the absence of an injunction. Irreparable injury means "the kind of injury for which money cannot compensate," *Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir.1982),

---

**3.** Because I find, as discussed below, that plaintiffs have demonstrated a likelihood of success on the merits of their claim that the New York Act violates the Commerce Clause, I do not rely on the "fair ground for litigation" standard. I note, however, that the standard would be applicable to this case because: (1) the action alleges constitutional violations, *Almonte v. Pierce*, 666 F.Supp. 517, 526 (S.D.N.Y.1987); (2) the public interest in a free flow of interstate commerce served by an injunction against enforcement of the Act counterbalances the public interest in protecting children served by the Act, *see Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980); and (3) the New York Legislature did not engage in any fact-finding regarding the public interest served by the Act before promulgating it. *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995).

and which is "neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989). Deprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury. *C & A Carbone, Inc. v. Town of Clarkstown,* 770 F.Supp. 848, 854 (S.D.N.Y.1991) (holding that a local waste disposal law caused irreparable injury to the plaintiffs' rights under the Commerce Clause). Thus, by demonstrating that the Act threatens their rights under the Commerce Clause, as will be discussed more fully below, the plaintiffs have shown both irreparable injury and a likelihood of success on the merits.

## II. *Federalism and the Internet: The Commerce Clause*

The borderless world of the Internet raises profound questions concerning the relationship among the several states and the relationship of the federal government to each state, questions that go to the heart of "our federalism." *See Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971) ("[O]ne familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses.") The Act at issue in the present case is only one of many efforts by state legislators to control the chaotic environment of the Internet. For example, the Georgia legislature has enacted a recent law prohibiting Internet users from "falsely identifying" themselves online. Ga.

Stat. 16–9–9.1. Similar legislation is pending in California. California Senate Bill SB–1533 (1996); *see also* Ilana DeBare, State Trademark Bill Ignites Net Turmoil, The Sacramento Bee, March 2, 1991, at F1. Texas and Florida have concluded that law firm web pages (apparently including those of out of state firms) are subject to the rules of professional conduct applicable to attorney advertising. See Texas Bar Advertising Comm., Interpretive Comment on Attorney Internet Advertising (1996); *see also Texans Against Censorship v. State Bar of Texas,* 888 F.Supp. 1328, 1369–70 (E.D.Tex.1995) (discussing applicability of Texas lawyers advertising regulation to the Internet), *aff'd,* 100 F.3d 953 (5th Cir.1996); Ethics Update, Fla. Bar News, January 1, 1996. Further, states have adopted widely varying approaches in the application of general laws to communications taking place over the Internet. Minnesota has aggressively pursued out-of-state advertisers and service providers who reach Minnesotans via the Internet; Illinois has also been assertive in using existing laws to reach out-of-state actors whose connection to Illinois occurs only by virtue of an Internet communication. See Mark Eckenwiler, States Get Entangled in the Web, Legal Times, Jan. 22, 1996, at § 35, § 37. Florida has taken the opposite route, declining to venture into online law enforcement until various legal issues (including, perhaps, the one discussed in the present opinion) have been determined. *Id.* at § 37.[4]

The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being ac-

---

4. Other jurisdictions internationally have also gotten into the act. In January, 1997, two associations dedicated to the preservation of France's linguistic purity filed suit against two private corporations and Georgia Tech Lorraine, a French university affiliated with the Georgia Institute of Technology, claiming that the defendants violated a French law that prohibits advertising in any language other than French by operating English-language sites on the World Wide Web. *See* Complaint filed by L'Association "Avenir de la Lengue Francaise" and L'Association "Defense de La Lengue Francaise," Jan. 6,

1996; *see also* E. Schneiderman & R. Kornreich, *Personal Jurisdiction and Internet Commerce,* N.Y.L.J., June 4, 1997, at 1. The French court dismissed the action as to Georgia Tech, but other efforts by foreign jurisdictions to regulate the Internet are likely to follow. In addition, Germany made headlines recently when its antipornography laws forced Compuserve to close access to over 200 Internet sites from anywhere in the world. *See* John Markoff, *Compuserve Bars Access to Internet Sex: German Laws Prompt the Provider to Block Pictures and Chat Groups,* Orange County Register, December 29, 1995.

cessed. Typically, states' jurisdictional limits are related to geography; geography, however, is a virtually meaningless construct on the Internet. The menace of inconsistent state regulation invites analysis under the Commerce Clause of the Constitution, because that clause represented the framers' reaction to overreaching by the individual states that might jeopardize the growth of the nation— and in particular, the national infrastructure of communications and trade—as a whole. *See Quill Corp. v. North Dakota,* 504 U.S. 298, 312, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992) ("Under the Articles of Confederation, state taxes and duties hindered and suppressed interstate commerce; the Framers intended the Commerce Clause as a cure for these structural ills."); *see* also The Federalist Nos. 7, 11 (A.Hamilton).

The Commerce Clause is more than an affirmative grant of power to Congress. As long ago as 1824, Justice Johnson in his concurring opinion in *Gibbons v. Ogden,* 9 Wheat. 1, 231–32, 239, 6 L.Ed. 23 (1824), recognized that the Commerce Clause has a negative sweep as well. In what commentators have come to term its negative or "dormant" aspect, the Commerce Clause restricts the individual states' interference with the flow of interstate commerce in two ways. The Clause prohibits discrimination aimed directly at interstate commerce, *see, e.g., Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and bars state regulations that, although facially nondiscriminatory, unduly burden interstate commerce, *see, e.g., Kassel v. Consolidated Freightways Corp. of Del.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). Moreover, courts have long held that state regulation of those aspects of commerce that by their unique nature demand cohesive national treatment is offensive to the Commerce Clause. *See, e.g., Wabash, St. L. & P. Ry. Co. v. Illinois,* 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886) (holding railroad rates exempt from state regulation).

■ Thus, as will be discussed in more detail below, the New York Act is concerned with interstate commerce and contravenes the Commerce Clause for three reasons. First, the Act represents an unconstitutional projection of New York law into conduct that occurs wholly outside New York. Second, the Act is invalid because although protecting children from indecent material is a legitimate and indisputably worthy subject of state legislation, the burdens on interstate commerce resulting from the Act clearly exceed any local benefit derived from it. Finally, the Internet is one of those areas of commerce that must be marked off as a national preserve to protect users from inconsistent legislation that, taken to its most extreme, could paralyze development of the Internet altogether. Thus, the Commerce Clause ordains that only Congress can legislate in this area, subject, of course, to whatever limitations other provisions of the Constitution (such as the First Amendment) may require.

## A. The Act Concerns Interstate Commerce

At oral argument, the defendants advanced the theory that the Act is aimed solely at intrastate conduct. This argument is unsupportable in light of the text of the statute itself, its legislative history, and the reality of Internet communications. The section in question contains no such limitation; it reads:

> A person is guilty of disseminating indecent material to minors in the second degree when: . . .
>
> > (3) Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, he intentionally uses any computer communication system allowing the input, output, examination or transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor.

N.Y. Penal Law § 235.21(3) (McKinney's 1997). Section 235.20, which contains the definitions applicable to the challenged portion of the Act, does not import any restriction that the criminal communication must take place entirely within the State of New York. By its terms, the Act applies to any communication, intrastate or interstate, that

fits within the prohibition and over which New York has the capacity to exercise criminal jurisdiction. *See Boyd v. Meachum*, 77 F.3d 60, 65 (2d Cir.1996) (holding that a criminal court "has personal jurisdiction over any party who appears before it, regardless of how his appearance was obtained"), *cert. denied*, —— U.S. ——, 117 S.Ct. 114, 136 L.Ed.2d 66 (1996); *see also United States v. Lussier*, 929 F.2d 25, 27 (1st Cir.1991); *United States v. Stuart*, 689 F.2d 759, 762 (8th Cir.1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983).

Further, the legislative history of the Act clearly evidences the legislators' understanding and intent that the Act would apply to communications between New Yorkers and parties outside the State, despite occasional glib references to the Act's "intrastate" applicability. The New York State Senate Introducer's Memorandum in Support of the Act contains a paragraph under the subtitle, "Justification," which states:

> Law enforcement agencies around the nation are becoming increasingly alarmed at the growing use of computer networks and other communications by pedophiles. As one observer noted, "perverts are moving from the playground to the internet." Several cases have come to light wherein a pedophile has *traveled clear across the country* to have sexual relations with a minor initially contacted and engaged through various computer networks.

(Affidavit of James Hershler, Exh. D) (emphasis added). A letter from the Bill's sponsor to Governor Pataki characterized sexually-infused Internet communications between adults and minors as "long-distance, high-tech sexual abuse." (*See* Letter dated July 11, 1996 from William Sears to Governor Pataki, designated page 3 in the Bill Jacket, Hershler Aff., Exh. A). Jeanine Pirro, the Westchester County District Attorney, wrote

a letter to Governor Pataki dated February 13, 1996 that similarly reflects the expectations of the Act's proponents that it would apply to interstate communications. Ms. Pirro's letter states:

> This bill was proposed partly in response to a Westchester County case wherein an adult male resident of Seattle, Washington, [one Alan Paul Barlow,] communicated about sexually explicit matters by computer with a thirteen year old girl over several months.

(Hershler Aff., Exh. F); *see also* John Heileman, *The Crusader*, The New Yorker, February 24 and March 3, 1997 (detailing Ms. Pirro's "crusade" to achieve the passage of the Act in the aftermath of the Barlow incident).[5] Ms. Pirro's references to this incident, known as the Barlow case, are echoed throughout defendants' memorandum of law. (*See* Defendants' Memorandum of Law in Opposition to Preliminary Injunction, pp. 15, 16, 17–18). Obviously, however, the Act would be completely ineffective in forestalling a pedophile like Barlow if it applied only to purely intrastate communications.

The conclusion that the Act must apply to interstate as well as intrastate communications receives perhaps its strongest support from the nature of the Internet itself. The Internet is wholly insensitive to geographic distinctions. In almost every case, users of the Internet neither know nor care about the physical location of the Internet resources they access. Internet protocols were designed to ignore rather than document geographic location; while computers on the network·do have "addresses," they are logical addresses on the network rather than geographic addresses in real space. The majority of Internet addresses contain no geographic clues and, even where an Internet address provides such a clue, it may be mis-

---

5. The defendants proposed Ms. Pirro as a witness for the evidentiary hearing, but then withdrew the proposal. Ms. Pirro's letter, which preceded the bill's signature into law by the Governor, is properly considered as part of the legislative history. *See Civil Service Employees Association, Inc. v. Oneida*, 78 A.D.2d 1004, 1005, 433 N.Y.S.2d 907 (4th Dep't 1980), *appeal denied*, 53 N.Y.2d 603, 439 N.Y.S.2d 1027, 421 N.E.2d 854 (1981). Ms. Pirro's testimony, on the other hand, would be a hindsight, post-enactment review of legislative intent by a non-legislator and would carry no probative weight. *See Bread Political Action Committee v. Federal Election Committee*, 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 1238 n. 3, 71 L.Ed.2d 432 (1982); *Frontier Ins. Co. v. New York*, 160 Misc.2d 437, 609 N.Y.S.2d 748, 752 (Ct.Cl.1993), *aff'd*, 197 A.D.2d 177, 610 N.Y.S.2d 647 (3d Dep't 1994).

leading. For example, in his article, *Federalism in Cyberspace*, 28 Conn. L.Rev. 1095, 1112 (1996), Professor Dan Burk described how he uses Seton Hall University's computer system to access the Internet, providing anyone who communicates with him (and is aware of Seton Hall's locale) a hint that he is in New Jersey. However, Professor Burk also has a guest account at a university in California which he continues to use even when he is in New Jersey; any clue derived from the California university's name within the Internet address would therefore be deceptive. In a similar vein, Ms. Kovacs testified that as she was using her computer to give an in-court demonstration of various Internet applications, she received an e-mail from a colleague who believed she was sending the message to Cincinnati, Ohio (where Ms. Kovacs is normally located); in fact, Ms. Kovacs was in New York and received the message here. (4/4/97 Tr., p. 61).

Moreover, no aspect of the Internet can feasibly be closed off to users from another state. An internet user who posts a Web page cannot prevent New Yorkers or Oklahomans or Iowans from accessing that page and will not even know from what state visitors to that site hail. Nor can a participant in a chat room prevent other participants from a particular state from joining the conversation. Someone who uses a mail exploder is similarly unaware of the precise contours of the mailing list that will ultimately determine the recipients of his or her message, because users can add or remove their names from a mailing list automatically. Thus, a person could choose a list believed not to include any New Yorkers, but an after-added New Yorker would still receive the message.[6]

E-mail, because it is a one-to-one messaging system, stands on a slightly different footing than the other aspects of the Internet. Even in the context of e-mail, however, a message from one New Yorker to another New Yorker may well pass through a number of states en route. The Internet is, as described above, a redundant series of linked computers. Thus, a message from an Internet user sitting at a computer in New York may travel via one or more other states before reaching a recipient who is also sitting at a terminal in New York.

The system is further complicated by two Internet practices: packet switching and caching. "Packet switching" protocols subdivide individual messages into smaller packets that are then sent independently to the destination, where they are automatically reassembled by the receiving computer. If computers along the route· become overloaded, packets may be rerouted to computers with greater capacity. A single message may—but does not always—travel several different pathways before reaching the receiving computer. "Caching" is the Internet practice of storing partial or complete duplicates of materials from frequently accessed sites to avoid repeatedly requesting copies from the original server. The recipient has no means of distinguishing between the cached materials and the original. Thus, the user may be accessing materials at the original site, or he may be accessing copies of those materials cached on a different machine located anywhere in the world.

The New York Act, therefore, cannot effectively be limited to purely intrastate communications over the Internet because no such communications exist. No user could reliably restrict her communications only to New York recipients. Moreover, no user could avoid liability under the New York Act simply by directing his or her communications elsewhere, given that there is no feasible way to preclude New Yorkers from accessing a Web site, receiving a mail exploder message or a newsgroup posting, or participating in a chat room. Similarly, a user has no way to ensure that an e-mail does not pass through New York even if the ultimate recipient is not located there, or that a message never leaves New York even if both sender and recipient are located there.

This conclusion receives further support from the unchallenged testimony that plaintiff's introduced in the form of declarations.

---

6. Judge Stein recently concluded that these realities meant that one whose only contact with the forum occurs via the Internet is not susceptible to suit there. *Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996).

For example, Stacy Horn, the president of ECHO, an electronic cultural salon, testified that "[c]onference participants do not know, and have no way to determine, the ... geographic location of other participants." (Decl. of Stacy Horn, sworn to on March 12, 1997, at p. 6). Oren Teicher, the President of the American Booksellers Foundation for Free Expression, indicated that:

> Much of the Internet use by booksellers is interstate in nature. For example, any bookseller's Web page can be accessed by Internet users not only throughout the United States, but throughout the world. Similarly, ABFFE members from across the country communicate with one another as well as Internet users across the country via e-mail. Moreover, ABFFE users cannot effectively prevent their Web sites or discussion groups from being accessed by New York users.

(Decl. of Oren Teicher, sworn to on March 26, 1997, at p. 4). Lawrence J. Kaufman, the Vice President of the Magazine Publishers of America, Inc., a trade association for the consumer magazine industry, noted that "Online users anywhere in the world can access the content provided by MPA members on the Web and via e-mail. These members cannot effectively prevent their Web sites from being accessed by New York users." (Decl. of Lawrence J. Kaufman, sworn to on March 26, 1997, at p. 2).

■ The Act is therefore necessarily concerned with interstate communications. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988) (holding that only if a statute is "readily susceptible" to a narrowing construction will the court apply such a construction to save an otherwise unconstitutional law). The next question that requires an answer as a threshold matter is whether the types of communication involved constitute "commerce" within the meaning of the Clause.

The definition of commerce in the Supreme Court's decisions has been notably broad. Most recently, in *Camps Newfound Owatonna, Inc. v. Town of Harrison, Maine,* — U.S. —, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997), the Court rejected defendant's argu-

ments that the Commerce Clause was inapplicable to a discriminatory real estate tax deduction, either because "campers are not 'articles of commerce'" or because the plaintiff camp's "product is delivered and 'consumed' entirely within Maine." Id. at —, 117 S.Ct. at 1596. In the past, the Court has held that interstate commerce is affected by private race discrimination that limited access to a hotel and thereby impeded interstate commerce in the form of travel. *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 244, 258, 85 S.Ct. 348, 351, 358, 13 L.Ed.2d 258 (1964).

In the present case, the parties have stipulated that:

> The Internet is not exclusively, or even primarily, a means of commercial communication. Many commercial entities maintain Web sites to inform potential consumers about their goods and services, or to solicit purchases, but many other Web sites exist solely for the dissemination of non-commercial information. The other forms of Internet communication—e-mail, bulletin boards, newsgroups, and chat rooms—frequently have non-commercial goals. For the economic and technical reasons set forth in the following paragraphs, the Internet is an especially attractive means for not-for-profit entities or public interest groups to reach their desired audiences. There are examples in the plaintiffs' affidavits of some of the non-commercial uses that the Internet serves. Plaintiff Peacefire offers information on its Internet site regarding the rights of minors on the Internet. Plaintiff Art on the Net allows artists to post their works on the World Wide Web. Plaintiff American Civil Liberties Union offers information on civil liberties issues.

(Joint Stipulation of Facts, ¶ 79). This stipulation, however inartfully worded, cannot insulate the statute at issue from Commerce Clause scrutiny. The non-profit nature of certain entities that use the Internet or of certain transactions that take place over the Internet does not take the Internet outside the Commerce Clause. *See Camps Newfound,* at —, 117 S.Ct. at 1597; *Hughes v. Oklahoma,* 441 U.S. 322, 326 n. 2, 99 S.Ct.

1727, 1731 n. 2, 60 L.Ed.2d 250 (1979); *Philadelphia v. New Jersey,* 437 U.S. 617, 621–23, 98 S.Ct. 2531, 2534–35, 57 L.Ed.2d 475 (1978).

The Supreme Court has expressly held that the dormant commerce clause is applicable to activities undertaken without a profit motive. In *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), the Court examined the constitutionality of a California statute prohibiting the transport of indigent people into the state. The Court struck the statute as violative of the dormant Commerce Clause, reasoning that "the transportation of persons is 'commerce,' " and that the California law at issue raised an "unconstitutional barrier to that commerce." *Id.* at 172–73, 62 S.Ct. at 166. In making its threshold determination, the Court emphasized that "[i]t is immaterial whether or not the transportation is commercial in character." *Id.* at 172, n. 1, 62 S.Ct. at 166, n. 1; *see also Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 196–97, 61 L.Ed. 442 (1917); *Hoke v. United States,* 227 U.S. 308, 320, 33 S.Ct. 281, 283, 57 L.Ed. 523 (1913).

Commercial use of the Internet, moreover, is a growing phenomenon. *See, e.g.,* Don Clark, *Disney Launching Children's Web Site Only on Microsoft's On-Line Service,* Wall St. Journal, March 31, 1997 (describing Disney's efforts to create and market a fee-based Web service); *see also* Andrew Bowser, *Advertising on the Net,* New Orleans Citybusiness, March 6, 1995; John Casey, *Growing Potential of World Wide Web,* Business & Finance, The Irish Times, June 3, 1996. In addition, many of those users who are communicating for private, noncommercial purposes are nonetheless participants in interstate commerce by virtue of their Internet consumption. Many users obtain access to the Internet by means of an on-line service provider, such as America Online, which charges a fee for its services. "Internet service providers," including plaintiffs Panix, Echo, and NYC NET, also offer Internet access for a monthly or hourly fee. Patrons of storefront "computer coffee shops," such as New York's own CyberCafe, similarly pay for their access to the Internet, in addition to partaking of food and beverages sold by the cafe. Dial-in bulletin board systems often charge a fee for access. *See Katzenbach v. McClung,* 379 U.S. 294, 300–01, 85 S.Ct. 377, 381–82, 13 L.Ed.2d 290 (1964) (holding that an entity that purchases goods used in the provision of its services from interstate sources is an actor in interstate commerce even in connection with the provision of services within a single state).

The courts have long recognized that railroads, trucks, and highways are themselves "instruments of commerce," because they serve as conduits for the transport of products and services. *See Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 780, 65 S.Ct. 1515, 1525–26, 89 L.Ed. 1915 (1945). The Internet is more than a means of communication; it also serves as a conduit for transporting digitized goods, including software, data, music, graphics, and videos which can be downloaded from the provider's site to the Internet user's computer. For example, plaintiff BiblioBytes and members of plaintiff IDSA both sell and deliver their products over the Internet.

The inescapable conclusion is that the Internet represents an instrument of interstate commerce, albeit an innovative one; the novelty of the technology should not obscure the fact that regulation of the Internet impels traditional Commerce Clause considerations. The New York Act is therefore closely concerned with interstate commerce, and scrutiny of the Act under the Commerce Clause is entirely appropriate. As discussed in the following sections, the Act cannot survive such scrutiny, because it places an undue burden on interstate traffic, whether that traffic be in goods, services, or ideas.

**B. New York Has Overreached by Enacting a Law That Seeks To Regulate Conduct Occurring Outside its Borders**

The interdiction against direct interference with interstate commerce by state legislative overreaching is apparent in a number of the Supreme Court's decisions. In *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 499–500, 79 L.Ed. 1032 (1935), for example, Justice Cardozo authored an opin-

ion enjoining enforcement of a law that prohibited a dealer from selling within New York milk purchased from the producer in Vermont at less than the minimum price fixed for milk produced in New York. Justice Cardozo sternly admonished, "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk," finding that "[s]uch a power, if exerted, [would] set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." *Id.*

The Court has more recently confirmed that the Commerce Clause precludes a state from enacting legislation that has the practical effect of exporting that state's domestic policies. In *Edgar v. MITE,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Court examined the constitutionality of an Illinois anti-takeover statute that required a tender offeror to notify the Secretary of State and the target company of its intent to make a tender offer and the terms of the offer 20 days before the offer became effective. During the twenty-day period, the offeror was barred from communicating its offer to the shareholders, but the target company was free to disseminate information to its shareholders concerning the impending offer. *Id.* at 633, 102 S.Ct. at 2636. The statute defined "target company" as a corporation of which Illinois shareholders own 10% of the class of securities subject to the takeover offer, or for which any two of the following conditions are met: the corporation has its principal office in Illinois, is organized under Illinois law, or has at least 10% of its stated capital and paid-in surplus within Illinois. *Id.* at 625, 102 S.Ct. at 2632. The Court acknowledged that states traditionally retained the power to regulate intrastate securities transactions by enacting "blue-sky laws." *Id.* at 641, 102 S.Ct. at 2640. Nonetheless, the Court asserted that "[t]he Illinois Act differs substantially from state blue-sky laws in that it directly regulates transactions which take place across state lines, even if wholly outside the State of Illinois." *Id.* In striking the law as violative of the Commerce Clause, the Court found particularly egregious the fact that the Illinois law on its face

would apply to a transaction that would not affect a single Illinois shareholder if a corporation fit within the definition of a "target company." *Id.* at 642, 102 S.Ct. at 2640–41. The Court concluded "the Illinois statute is a direct restraint on interstate commerce and has a sweeping extraterritorial effect," because the statute would prevent a tender offeror from communicating its offer to shareholders both within and outside Illinois. Acceptance of the offer by any of the shareholders would result in interstate transactions; the Illinois statute effectively stifled such transactions during the waiting period and thereby disrupted prospective interstate commerce. Under the Commerce Clause, the projection of these extraterritorial "practical effect[s]," regardless of the legislators' intentions, " 'exceeded the inherent limits of the State's power.' " *Id.* at 642–43, 102 S.Ct. at 2641 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977)).

In the present case, a number of witnesses testified to the chill that they felt as a result of the enactment of the New York statute; these witnesses refrained from engaging in particular types of interstate commerce. In particular, I note the testimony of Rudolf Kinsky, an artist with a virtual studio on Art on the Net's Website. Mr. Kinsky testified that he removed several images from his virtual studio because he feared prosecution under the New York Act. (4/7/97 Tr., at 231–35). As described above, no Web siteholder is able to close his site to New Yorkers. Thus, even if Mr. Kinsky were located in California and wanted to display his work to a prospective purchaser in Oregon, he could not employ his virtual studio to do so without risking prosecution under the New York law.

Oren Teicher, the President of the American Booksellers Foundation for Free Expression, similarly testified to the stifling effects that the Act will have on prospective interstate commerce in books, stating that:

> The Internet is an important source of interstate business for ABFFE members ... [B]ooksellers conduct business over the Internet in a variety of ways. If the Act is not enjoined and ABFFE members are forced to self-censor rather than be

subject to criminal liability, they will suffer immeasurable injury because they will lose significant sales and goodwill generated by their use of the Internet with respect to both censored and noncensored materials and resources. If a bookstore must self-censor certain books, it loses the profits from the sale of those particular books generated from the books' listing on the booksellers' Web sites. In addition, the bookstore will lose even more business because it will appear that the bookstore has an incomplete or inadequate listing of books in its inventory and Internet users will choose to buy their books elsewhere. (Teicher Decl., pp. 4–5). Lawrence Kaufman, the Vice President of the Magazine Publishers of America, also testified to the interstate nature of the business conducted by MPA over the Internet and to the loss of sales and goodwill that MPA members will suffer if forced to self-censor in order to avoid criminal liability under the Act. In particular, Mr. Kaufman noted that Playboy magazine, an MPA member, occasionally posts electronic versions or excerpts from its magazines that might fall within the Act's prohibition, presumably in an effort to attract new readership and subscribers. (Kaufman Decl. pp. 2–3). *Edgar* teaches that for New York to attempt to strangle prospective interstate transactions between parties from states other than New York by this means offends the Commerce Clause.

The "extraterritoriality" analysis of the *Edgar* opinion commanded only a plurality of the Court. Later majority holdings, however, expressly adopted the underlying principles on which Justice White relied in *Edgar*. *See Healy v. The Beer Institute*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). In *Healy*, the Court assessed the constitutionality of a Connecticut statute that required that out-of-state beer shippers affirm that their prices were no higher than the prices being charged in the bordering states at the time of the affirmation. The Court derived three guiding principles from its prior cases. First, the Court emphasized that the "Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside the State's borders, whether or not the commerce has effects within the state." ' *Healy*, 491 U.S. at 336, 109 S.Ct. at 2499 (citing *Edgar*, 457 U.S. at 642–43, 102 S.Ct. at 2640–41; *Brown–Forman*, 476 U.S. at 581–83, 106 S.Ct. at 2085–87). Second, the Court instructed that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* (citing *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084). Finally, "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id.; cf. CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 88–89, 107 S.Ct. 1637, 1649–50, 95 L.Ed.2d 67 (1987).

Applying these principles to the Connecticut price-affirmation statute, the Court held that the statute had the undeniable and impermissible effect of controlling commercial activity occurring wholly outside Connecticut. In particular, the Court examined the practical impact of the statute, in light of the regulations prevailing in the neighboring states of Massachusetts and New York and determined that the affirmation law, when taken in conjunction with the laws that had been or might be enacted in neighboring states, created "just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Healy*, 491 U.S. at 337, 109 S.Ct. at 2500.

The *Edgar/Healy* extraterritoriality analysis rests on the premise that the Commerce

Clause has two aspects: it subordinates each state's authority over interstate commerce to the federal power of regulation (a vertical limitation), and it embodies a principle of comity that mandates that one state not expand its regulatory powers in a manner that encroaches upon the sovereignty of its fellow states (a horizontal limitation). The Court most recently recognized this duality in *BMW of North America, Inc. v. Gore,* —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In a seminal case concerning an American's most precious possession (if not his most precious rights), a BMW purchaser in Alabama sued after discovering that his new BMW had been repainted prior to sale, alleging that the failure to disclose the repainting constituted fraud under Alabama law. Although the difference caused by the repainting was apparently imperceptible to the layperson, when the purchaser brought his car to "Slick Finish," an independent detailer, to make it look "snazzier than it normally would appear," *BMW of North America, Inc. v. Gore,* 646 So.2d 619, 621 (Ala.1994), Mr. Slick, the aptly yclept proprietor, detected evidence that the car had been repainted. The plaintiff alleged that he had suffered $4,000 in actual damages, relying on the testimony of a former BMW dealer who estimated that the value of a repainted BMW was approximately 10% less than one that was "showroom new." Plaintiff further argued that a punitive damage award of $4 million was an appropriate penalty in light of evidence he introduced that BMW had sold 983 refinished cars as new, including 14 in Alabama.

At trial, BMW acknowledged that it had adopted a nationwide policy of disclosing predelivery repairs only when the cost of the repairs exceeded 3% of the car's suggested retail price. The jury returned a verdict finding BMW liable for compensatory damages of $4,000 and punitive damages of $4 million, apparently calculated by multiplying the number of sales in all states of refinished cars by $4,000. BMW filed a post-trial motion to set aside the punitive damages award, contending that its nondisclosure policy was consistent with the laws of 25 states defining the disclosure obligations of automobile manufacturers; BMW asserted that the punitive damages were excessive because they were computed on the basis of sales that took place in jurisdictions where its conduct was perfectly legal.

The Supreme Court agreed. The Court indicated that while Congress could enact a law requiring full disclosure of every presale repair to an automobile, no single state could impose such a policy nationwide by imposing economic sanctions aimed at changing the conduct of a tortfeasor in other states. Id. at ——, 116 S.Ct. at 1596. Speaking emphatically of the need to confine state legislation to its proper constitutional sphere, the Court stated:

> [O]ne State's power to impose burdens on the interstate market for automobiles is not only subordinate to the federal power over interstate commerce, *Gibbons v. Ogden,* 9 Wheat. 1, 194–96, 6 L.Ed. 23 (1824), but is also constrained by the need to respect the interests of other States, *see, e.g., Healy v. Beer Institute,* 491 U.S. 324, 335–36, 109 S.Ct. 2491, 2498–99, 105 L.Ed.2d 275 (1989) (the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres" (footnote omitted)); *Edgar v. MITE Corp.,* 457 U.S. 624, 643, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982).

*Id.* The need to contain individual state overreaching thus arises not from any disrespect for the plenary authority of each state over its own internal affairs but out of a recognition that true protection of each state's respective authority is only possible when such limits are observed by all states.[7]

---

**7.** The Court's injunction against extraterritorial regulation is long-established. *See Huntington v. Attrill,* 146 U.S. 657, 669, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extraterritorial effect only by the comity of other States"); *New York Life Ins. Co. v. Head,* 234 U.S. 149, 161, 34 S.Ct. 879, 881–82, 58 L.Ed. 1259 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State ... without throwing down the constitutional

The nature of the Internet makes it impossible to restrict the effects of the New York Act to conduct occurring within New York. An Internet user may not intend that a message be accessible to New Yorkers, but lacks the ability to prevent New Yorkers from visiting a particular Website or viewing a particular newsgroup posting or receiving a particular mail exploder. Thus, conduct that may be legal in the state in which the user acts can subject the user to prosecution in New York and thus subordinate the user's home state's policy—perhaps favoring freedom of expression over a more protective stance—to New York's local concerns. *See Bigelow v. Virginia*, 421 U.S. 809, 824, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State."). New York has deliberately imposed its legislation on the Internet and, by doing so, projected its law into other states whose citizens use the Net. *See Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 774, 65 S.Ct. 1515, 1522–23, 89 L.Ed. 1915 (1945) ("If one state may regulate train lengths, so may all others, and they need not prescribe the same maximum limitation. The practical effect of [a law limiting train lengths] is to control train operations beyond the boundaries of the state exacting it because of the necessity of breaking up and reassembling long trains at the nearest terminal points, before entering and after leaving the regulating state."). This encroachment upon the authority which the Constitution specifically confers upon the federal government and upon the sovereignty of New York's sister states is per se violative of the Commerce Clause.

barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities dealing directly with it do not abound.").

8. The distinction between direct regulations of interstate commerce, which are subject to a per

## C. The Burdens the Act Imposes on Interstate Commerce Exceed Any Local Benefit

Even if the Act were not a per se violation of the Commerce Clause by virtue of its extraterritorial effects, the Act would nonetheless be an invalid indirect regulation of interstate commerce, because the burdens it imposes on interstate commerce are excessive in relation to the local benefits it confers. The Supreme Court set forth the balancing test applicable to indirect regulations of interstate commerce in *Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).[8] *Pike* requires a twofold inquiry. The first level of examination is directed at the legitimacy of the state's interest. The next, and more difficult, determination weighs the burden on interstate commerce in light of the local benefit derived from the statute.

In the present case, I accept that the protection of children against pedophilia is a quintessentially legitimate state objective—a proposition with which I believe even the plaintiffs have expressed no quarrel. *See New York v. Ferber*, 458 U.S. 747, 756–57, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'") (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)); *see also Sable v. Federal Communications Commission*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards."). The defendants spent considerable time in their

se rule of invalidation, and indirect regulations subject to the less stringent balancing test has never been sharply defined. In either situation, however, the "critical consideration is the overall effect of the statute on both local and interstate activity." *See Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084; *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440–41, 98 S.Ct. 787, 793–94, 54 L.Ed.2d 664 (1978).

Memorandum and at argument asserting the legitimacy of the state's interest. Even with the fullest recognition that the protection of children from sexual exploitation is an indisputably valid state goal, however, the present statute cannot survive even the lesser scrutiny to which indirect regulations of interstate commerce are subject under the Constitution. The State cannot avoid the second stage of the inquiry simply by invoking the legitimate state interest underlying the Act. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977) ("[A] finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry."); *Bibb v. Navajo Freight Lines,* 359 U.S. 520, 528, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959) (holding that "local safety measures that are nondiscriminatory [can] place an unconstitutional burden on interstate commerce"); *see also Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951) (holding that permitting a state to discriminate against interstate commerce to promote the health and safety of its citizens "would mean that the Commerce Clause of itself imposes no limitations on state action ... save for the rare instances where a state artlessly discloses an avowed purpose to discriminate against interstate goods."); *Southern Pac. Co. v. Arizona, ex rel. Sullivan,* 325 U.S. 761, 779, 65 S.Ct. 1515, 1525, 89 L.Ed. 1915 (1945) ("The principle that, without controlling Congressional action, a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by

'simply invoking the convenient apologetics of the police power.'") (quoting *Kansas City Southern Ry. v. Kaw Valley Drainage Dist.,* 233 U.S. 75, 79, 34 S.Ct. 564, 565, 58 L.Ed. 857 (1914)).

The local benefits likely to result from the New York Act are not overwhelming. The Act can have no effect on communications originating outside the United States. As the three-judge panel that struck the federal analog of the New York Act, the Communications Decency Act, on First Amendment grounds concluded:

> [The Act] will almost certainly fail to accomplish the Government's interest in shielding children from pornography on the Internet. Nearly half of Internet communications originate outside the United States, and some percentage of that figure represents pornography. Pornography from, say, Amsterdam, will be no less appealing to a child on the Internet than pornography from New York City, and residents of Amsterdam have little incentive to comply with the [Act].

*American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 882 (E.D.Pa.1996). Further, in the present case, New York's prosecution of parties from out of state who have allegedly violated the Act, but whose only contact with New York occurs via the Internet, is beset with practical difficulties, even if New York is able to exercise criminal jurisdiction over such parties. The prospect of New York bounty hunters dragging pedophiles from the other 49 states into New York is not consistent with traditional concepts of comity.

Moreover, the State has espoused an interpretation of the Act that, if accepted,[9] would

---

9. The state's construction of the Act is unsupportable in light of the plain language of the statute and the interpretation that has been applied to closely related statutes. The Act applies to "communication[s] which, in whole or in part, depict[ ] actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which [are] harmful to minors." The defendants contend that "depict" embraces only pictorial images. The dictionary definition of "depict," however, includes both visual representations and "description." Webster's Third New International Dictionary 605 (1981). The Act itself defines material that is harmful to minors as including any "description or representation," supporting an interpretation of the word "depict" that in-

cludes both text and pictures. Further, the Act is intended to extend liability under the statute as it existed prior to amendment. Cases brought under the prior law confirmed its applicability to sexually frank text, as well as pictures. *See People v. Lida,* 42 Misc.2d 56, 247 N.Y.S.2d 421 (N.Y.City Crim.Ct.) (finding that magazine containing short stories dealing with sex as well as photographs showing nude and partially nude women fell within the prohibition of Penal Law 1909 § 484–h [now Penal Law § 235.21], proscribing sale of magazines to minors), *aff'd,* 43 Misc.2d 692, 252 N.Y.S.2d 142 (1964); *see also People v. Ginsberg,* 56 Misc.2d 882, 290 N.Y.S.2d 239 (Dist.1966) (holding that evidence demon-

further undermine its effectiveness. According to defendant, the Act reaches only pictorial messages that are harmful to minors and has no impact on purely textual communications. Were this interpretation adopted, Mr. Barlow, whose conduct supposedly motivated the supporters of the Act, would escape prosecution because his messages were verbal. *See The Crusader, supra,* at 122 (reporting Barlow's message to New York girl as "I'm feeling really horny—I think Oscar is making a 'statement.' We both want you very much. I'm thinking about you, & he's thinking about Love Bunny & tingling like mad.")

The Act is, of course, not the only law in New York's statute books designed to protect children against sexual exploitation. The State is able to protect children through vigorous enforcement of the existing laws criminalizing obscenity and child pornography. *See United States v. Thomas,* 74 F.3d 701, 704–05 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 74, 136 L.Ed.2d 33 (1996). Moreover, plaintiffs do not challenge the sections of the statute that criminalize the sale of obscene materials to children, over the Internet or otherwise, and prohibit adults from luring children into sexual contact by communicating with them via the Internet. *See* N.Y. Penal Law § 235.21(1); N.Y. Penal Law § 235.22(2). The local benefit to be derived from the challenged section of the statute is therefore confined to that narrow class of cases that does not fit within the parameters of any other law. The efficacy of the statute is further limited, as discussed above, to those cases which New York is realistically able to prosecute.

The conclusion that the New York Act has a very limited effect was bolstered by the testimony of Michael McCartney, an investigator with the New York State Attorney General's office. Mr. McCartney testified that he personally had logged over 600 hours investigating on-line criminal activity. (4/3/97 Tr., p. 12). Despite this extensive investment of time, Mr. McCartney admitted that he had investigated only two cases involving the dissemination of indecent materials to minors over the Internet that did not fall into the category of child pornography (which is, of course, subject to prosecution under other laws). (*Id.,* p. 36). In one case, further investigation disclosed that the e-mail conversation actually took place between two adults and thus was outside the terms of the Act. (*Id.*). In the second case, Mr. McCartney was never able to determine which of the people in the household that held the Internet access account was responsible for sending the messages and pictures in question; he therefore never determined whether the sender was an adult. (*Id.,* p. 37). In neither case did the Attorney General's office institute a prosecution. In fact, the Attorney General to date has not brought any prosecutions under the Act at all. (*Id.,* p. 15). By contrast, Mr. McCartney described with justifiable pride his participation in the sting operation that resulted in the arrest of a student at SUNY who was using the Internet to contact a child; the defendant in that case, however, was charged under N.Y. Penal Law § 263, which prohibits an adult from promoting the sexual performance of a child. (*Id.,* p. 12).

Balanced against the limited local benefits resulting from the Act is an extreme burden on interstate commerce. The New York Act casts its net worldwide; moreover, the chilling effect that it produces is bound to exceed the actual cases that are likely to be prosecuted, as Internet users will steer clear of the Act by significant margin. *See ACLU,* 929 F.Supp. at 863 (holding that individuals, uncertain of the reach of the CDA, will undoubtedly " 'steer far wider of the unlawful zone' ") (citing *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964)); *see also* testimony of Maurice J. Freedman, Director of Westchester Library System, 4/7/97 Tr., at p. 209 ("My concern about prosecution in the context of this court proceeding is in relation to this Act. When I became aware of this Act and its implications for public libraries, as I perceived those implications, I at that point became quite con-

---

strating that defendant, knowing buyer to be under 17, sold material containing pictures and photographs depicting female nudity and verbal descriptions and narrative accounts of sexual

conduct and excitement was sufficient to sustain conviction for selling material harmful to minors), *aff'd,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

cerned—and scared might be another word—for being arrested or being in violation."). At oral argument, the State asserted that only a small percentage of Internet communications are "harmful to minors" and would fall within the proscriptions of the statute; therefore, the State argued, the burden on interstate commerce is small. On the record before me, I conclude that the range of Internet communications potentially affected by the Act is far broader than the State suggests. I note that in the past, various communities within the United States have found works including *I Know Why the Caged Bird Sings* by Maya Angelou, *Funhouse* by Dean Koontz, *The Adventures of Huckleberry Finn* by Mark Twain, and *The Color Purple* by Alice Walker to be indecent. (Teicher Decl., p. 3). Even assuming, arguendo, that the Act applies only to pictures, a number of Internet users take advantage of the medium's capabilities to communicate images to one another and, again, I find that the range of images that might subject the communicator to prosecution (or reasonably cause a communicator to fear prosecution) is far broader than defendants assert. For example, many libraries, museums and academic institutions post art on the Internet that some might conclude was "harmful to minors." Famous nude works by Botticelli, Manet, Matisse, Cezanne and others can be found on the Internet. In this regard, I point out that a famous painting by Manet which shows a nude woman having lunch with two fully clothed men was the subject of considerable protest when it first was unveiled in Paris, as many observers believed that it was "scandalous." (Declaration of Judith F. Krug, sworn to in March, 1997, at p. 5). Lesser known artists who post work over the Internet may face an even greater risk of prosecution, because the mantle of respectability that has descended on Manet is not associated with their as yet obscure names. Lile Elam, the founder of Art on the Net, submitted a Declaration that included samples of the types of work found on Art on the Net's site; certain of the images might be considered harmful to minors in some communities, including several nudes and a very dark, disturbing short story entitled "Two Running Rails of Mercury," accompa-

nied by a picture of a woman's nude body dissolving into railroad tracks. (Declaration of Lile Elam, sworn to on March 13, 1997, Exh. 6). Rudolf Kinsky testified to his perception of the greater risk run by an unrenowned artist who posts controversial images on the Internet; when he was asked by defendants if a work by Corbet could subject the artist to prosecution, he answered, "His works are established; they are known. This is a different situation. Could be or could not, but my situation, when I am at the beginning of my career, and someone can, because I am not known, I have no established name and everything, I can still be prosecuted." (4/7/97 Tr., at 250). Individuals who wish to communicate images that might fall within the Act's proscriptions must thus self-censor or risk prosecution, a Hobson's choice that imposes an unreasonable restriction on interstate commerce. *See Allen B. Dumont Labs., Inc. v. Carroll*, 86 F.Supp. 813, 816 (1949) (holding that Pennsylvania state law requiring that motion pictures be submitted for review by a censorship board prior to being exhibited in the state imposed an undue and unreasonable burden on interstate commerce), *aff'd*, 184 F.2d 153 (3d Cir.1950), *cert. denied*, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951).

Moreover, as both three-judge panels that struck the federal statute have found, the costs associated with Internet users' attempts to comply with the terms of the defenses that the Act provides are excessive. Both courts that addressed the Communications Decency Act found that these costs of compliance, coupled with the threat of serious criminal sanctions for failure to comply, could drive some Internet users off the Internet altogether. *See ACLU*, 929 F.Supp. at 855–56 ("Many speakers who display arguably indecent content on the Internet must choose between silence and the risk of prosecution ... [the] defenses are not technologically or economically feasible for most providers"); *Shea*, 930 F.Supp. at 942–48 (finding that the defenses provided by the CDA do not offer a safe harbor to Internet users, who are then faced with the choice between complying, despite economic and technological barriers, or refraining from the Internet posting that potentially subjects

them to prosecution). While the defenses in the Act are not identical to those present in the CDA, the cost analysis undertaken by the *ACLU* and *Shea* courts is equally applicable to both statutes.

The severe burden on interstate commerce resulting from the New York statute is not justifiable in light of the attenuated local benefits arising from it. The alternative analysis of the Act as an indirect regulation on interstate commerce therefore also mandates the issuance of the preliminary injunction sought by plaintiffs.

### D. The Act Unconstitutionally Subjects Interstate Use of the Internet to Inconsistent Regulations

Finally, a third mode of Commerce Clause analysis further confirms that the plaintiffs are likely to succeed on the merits of their claim that the New York Act is unconstitutional. The courts have long recognized that certain types of commerce demand consistent treatment and are therefore susceptible to regulation only on a national level. The Internet represents one of those areas; effective regulation will require national, and more likely global, cooperation. Regulation by any single state can only result in chaos, because at least some states will likely enact laws subjecting Internet users to conflicting obligations. Without the limitation's imposed by the Commerce Clause, these inconsistent regulatory schemes could paralyze the development of the Internet altogether.

In numerous cases, the Supreme Court has acknowledged the need for coordination in the regulation of certain areas of commerce. As long ago as 1886, the Supreme Court stated:

> Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce, as thus defined, there can be only one system of rules, applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it

by separate states is not, therefore, permissible.

*Wabash, St. L. & P. Ry. Co. v. Illinois*, 118 U.S. 557, 574–75, 7 S.Ct. 4, 12, 30 L.Ed. 244 (1886). The Court in *Wabash* struck the Illinois statute at issue, which purported to establish interstate railway rates, stating "[t]hat this species of regulation is one which must be, if established at all, of a general and national character, and cannot be safely and wisely remitted to local rules and regulations, we think is clear from what has already been said." *Id.* at 577, 7 S.Ct. at 13.

Similarly, in *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), the Court addressed the constitutionality of an Arizona statute that limited the length of trains within the state to fourteen passenger and seventy freight cars. The lower court's findings demonstrated that 93% of the freight traffic and 95% of the passenger traffic in Arizona was interstate; moreover, the Court endorsed the findings that travel by trains of more than fourteen passenger cars and more than seventy freight cars over the main lines of the United States was standard practice, and that the Arizona law had the effect of forcing railroads to decouple their trains in Texas or New Mexico and reform the train at full length in California. *Id.* at 774, 65 S.Ct. at 1522–23. Thus, the practical impact of the Arizona law was to control the length of trains, as the Court put it, "all the way from Los Angeles to El Paso." *Id.* The Court concluded that the Arizona train limit law imposed a serious burden on interstate commerce, noting that various states had imposed varying limits. The Court stated:

> With such laws in force in states which are interspersed with those having no limit on train lengths, the confusion and difficulty with which interstate operations would be burdened under the varied system of state regulation and the unsatisfied need for uniformity in such regulation, if any, are evident.

*Id.* at 773–74, 65 S.Ct. at 1522. In striking the Arizona law as an unconstitutional intrusion on interstate commerce, the Court relied on a long-established rule barring the states from regulating "those phases of the national

commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Id.* at 767, 65 S.Ct. at 1519 (citing *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 (1824); *Cooley v. Board of Wardens,* 12 How. 299, 319, 13 L.Ed. 996 (1851); *Leisy v. Hardin,* 135 U.S. 100, 108–09, 10 S.Ct. 681, 683–84, 34 L.Ed. 128 (1890); *Minnesota Rate Cases,* 230 U.S. 352, 400, 33 S.Ct. 729, 740, 57 L.Ed. 1511 (1913); *Edwards v. People of State of California,* 314 U.S. 160, 176, 62 S.Ct. 164, 168, 86 L.Ed. 119 (1941)).

In *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), the Court examined an Illinois statute that required the use of contour mudguards on trucks in Illinois. The Court took note of the fact that straight or conventional mudguards were permissible in most other states and actually required in Arkansas. *Id.* at 526, 79 S.Ct. at 966. Recognizing the need for coordinated legislation, the Court stated that "[t]he conflict between the Arkansas regulation and the Illinois regulation ... suggests that this regulation of mudguards is not one of those matters 'admitting of diversity of treatment, according to the special requirements of local conditions.'" *Id.* at 529, 79 S.Ct. at 968 (quoting *Sproles v. Binford,* 286 U.S. 374, 390, 52 S.Ct. 581, 585–86, 76 L.Ed. 1167 (1932)). The Court struck the Illinois law as imposing an undue burden on interstate commerce, in part because Illinois was insisting upon "a design out of line with the requirements of almost all the other states." *Id.*

The Internet, like the rail and highway traffic at issue in the cited cases, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations. Regulation on a local Level, by contrast, will leave users lost in a welter of inconsistent laws, imposed by different states with different priorities. New York is not the only state to enact a law purporting to regulate the content of communications on the Internet. Already Oklahoma and Georgia have enacted laws designed to protect minors from indecent communications over the Internet; as might be expected, the states have selected different methods to accomplish their aims.

Georgia has made it a crime to communicate anonymously over the Internet, while Oklahoma, like New York, has prohibited the online transmission of material deemed harmful to minors. *See* Ga.Code Ann. § 16–19–93.1 (1996); Okla. Stat. tit. 21, § 1040.76 (1996).

Moreover, the regulation of communications that may be "harmful to minors" taking place over the Internet poses particular difficulties. New York has defined "harmful to minors" as including:

> that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:
>
> (a) Considered as a whole, appeals to the prurient interest in sex of minors; and
>
> (b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
>
> (c) Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.

N.Y. Penal Law § 235.20(6). Courts have long recognized, however, that there is no single "prevailing community standard" in the United States. Thus, even were all 50 states to enact laws that were verbatim copies of the New York Act, Internet users would still be subject to discordant responsibilities. To use an example cited by the court in *ACLU v. Reno,* the Broadway play *Angels in America,* which concerns homosexuality and AIDS and features graphic language, was immensely popular in New York and in fact earned two Tony awards and a Pulitzer prize. *ACLU,* 929 F.Supp. at 852–53. In Charlotte, North Carolina, however, a production of the drama caused such a public outcry that the Mecklenberg County Commission voted to withhold all public funding from arts organizations whose works "expose the public to perverted forms of sexuality." Eric Harrison, *Charlotte Ban on Funding Questions Community Culture Commission—Boycotts "Perverted Sexuality",* Milwaukee J. & Sentinel, April 21, 1997, at 3. The Supreme Court has always recognized that "our nation is simply too big and too

diverse for this Court to reasonably expect that such standards [of what is patently offensive] could be articulated for all 50 states in a single formulation." *Miller*, 413 U.S. at 30, 93 S.Ct. at 2618.

As discussed at length above, an Internet user cannot foreclose access to her work from certain states or send differing versions of her communication to different jurisdictions. In this sense, the Internet user is in a worse position than the truck driver or train engineer who can steer around Illinois or Arizona, or change the mudguard or train configuration at the state line; the Internet user has no ability to bypass any particular state. The user must thus comply with the regulation imposed by the state with the most stringent standard or forego Internet communication of the message that might or might not subject her to prosecution. For example, a teacher might invite discussion of *Angels In America* from a Usenet newsgroup dedicated to the literary interests of high school students. Quotations from the play might not subject her to prosecution in New York[10]—but could qualify as "harmful to minors" according to the community standards prevailing in Oklahoma. The teacher cannot tailor her message on a community-specific basis and thus must take her chances or avoid the discussion altogether.

Further development of the Internet requires that users be able to predict the results of their Internet use with some degree of assurance. Haphazard and uncoordinated state regulation can only frustrate the growth of cyberspace. The need for uniformity in this unique sphere of commerce requires that New York's law be stricken as a violation of the Commerce Clause.

### III. *The First Amendment and the Internet*

Plaintiffs have also asserted their entitlement to a preliminary injunction on the grounds that the Act unconstitutionally burdens free speech. Plaintiffs' ready ability to demonstrate the Act's unconstitutionality under the Commerce Clause, however, provides fully adequate support for the issuance of a preliminary injunction at this time. Moreover, the Supreme Court heard argument on a First Amendment challenge to the federal statute, the CDA, on March 19, 1997. The State vigorously argues that its law was designed to avoid the constitutional pitfalls presented by the CDA; however, the New York Act was clearly modelled on the CDA, and numerous provisions of the New York Act mirror their federal counterparts. *See* New York State Executive Charter Memorandum, annexed as Exhibit A to Declaration of Anat Hakim, sworn to on March 21, 1997 ("This bill ... is consistent with the federal statute"); Letter from William Sears to Governor Pataki, dated July 11, 1996, annexed as Exhibit A to Hershler Aff't ("This bill is consistent with the Federal Communications Decency Act"); Introducer's Memorandum in Support of Amended Senate Bill S. 210–E and Assembly Bill A. 3967–C, annexed as Exhibit G to Hershler Aff't ("Amendments were necessary for the bill to be consistent with the recently passed Federal Communications Decency Act.... Furthermore, it should be noted that the 'harmful to minors' standard contained in the charging language of the offense is consistent with the Federal law...."). I believe any determination of plaintiffs' First Amendment challenge should therefore await the guidance to be provided by the Supreme Court's forthcoming opinion.

### CONCLUSION

The protection of children from pedophilia is an entirely valid and laudable goal of State legislation. The New York Act's attempts to effectuate that goal, however, fall afoul of the Commerce Clause for three reasons. First, the practical impact of the New York Act results in the extraterritorial application of New York law to transactions involving citizens of other states and is therefore per se

---

**10.** Further distinctions may exist within the state of New York. The community standards prevailing in New York City may well be different than the community standards prevailing in, for example, Rensselaer County. *See, e.g., United States v. Various Articles of Obscene Merchandise, Schedule No. 2102*, 709 F.2d 132, 134, 137 (2d Cir.

1983) (upholding the district court's conclusion that "detailed portrayals of genitalia, sexual intercourse, fellatio, and masturbation" including the film "Deep Throat" and other pornographic films and magazines, are not obscene, "in light of the community standards prevailing in New York City.")

violative of the Commerce Clause. Second, the benefits derived from the Act are inconsequential in relation to the severe burdens it imposes on interstate commerce. Finally, the unique nature of cyberspace necessitates uniform national treatment and bars the states from enacting inconsistent regulatory schemes. Because plaintiffs have demonstrated that they are likely to succeed on the merits of their claim under the Commerce Clause and that they face irreparable injury in the absence of an injunction, the motion for a preliminary injunction is granted.

Defendants are enjoined from institutinq any prosecutions under the Act, until further Order of this Court. Plaintiffs shall submit a proposed form of injunction on two days' notice.

SO ORDERED: