**Billy Ray HORTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–90–00233–CR.**

Court of Appeals of Texas,
Tyler.

Dec. 31, 1993.

Rehearing Denied June 15, 1994.

Discretionary Review Refused
June 15, 1994.

Jeff L. Haas, Tyler, for appellant.

Amy Blalock, Asst. Dist. Atty., Tyler, for appellee.

Before RAMEY, C.J., and BILL BASS and HOLCOMB, JJ.

HOLCOMB, Justice.

Appellant appeals his conviction of murder by a jury and its assessment of punishment of ten years imprisonment.

Appellant has assigned seven points of error. By his first point of error, Appellant contends that the evidence is insufficient to sustain a verdict of guilty for the offense of murder. Billy Ray Horton, Thomas E. Ladner, and James M. Hyden were indicted separately but tried jointly for the murder of Loyal Garner, Jr.[1]

At trial, Alton Maxie testified that he, his brother Johnnie Maxie, and Loyal Garner, Jr., the deceased, left Florian, Louisiana, on Christmas day around 1:30 p.m. to look for a timing chain for his disabled pickup truck. They could not find a timing chain in or near Florian because the businesses were closed for Christmas. They decided to go to Liberty, located in Newton County, Texas, to pick up Johnnie Maxie's vehicle which was at his wife's house. On the way, they stopped at a liquor store and purchased beer, whiskey, and rum. At approximately 7:00 p.m. they

---

1.  We have joined the appeals of Thomas E. Ladner and James M. Hyden and addressed them together in our cause numbers 12–90–00225–CR and 12–90–00253–CR.

were stopped by Police Chief Thomas E. Ladner and Deputy Sheriff James M. Hyden. Garner was charged with DWI and the two Maxie brothers were charged with public intoxication. After their arrest, they were taken to the Sabine County Jail, booked in, and then placed in the detoxification tank. After being placed in the tank, they banged on the cell door to get someone's attention so they could make a telephone call to let their families know where they were. Between 9:30 and 10:00 p.m., Ladner and Hyden came to the tank and asked who was banging on the door and yelling. Garner told them that he was the one, whereupon Ladner hit Garner in the head at least three times with a slap-jack. Alton Maxie further testified that after slapping Garner with the slap-jack, Ladner grabbed Garner in a neck hold and Hyden helped pull Garner out of the tank. At the time Garner was taken from the tank he was able to walk. Alton further testified that on the way down the hall, he could tell that Garner was being "beaten." Ten to fifteen minutes later, when Ladner and Hyden brought Garner back to the tank, he was bleeding from a cut in the back of his head and there was blood on his shirt. Ladner and Hyden laid Garner down on a concrete ledge in the tank and he slumped over. Ladner and Hyden then took Alton Maxie to the book-in room and asked him if he wanted "some of the same." Alton was not struck. Alton testified that while he was in the book-in room, Ladner was hitting a night stick against his own hand.

Later that night, Alton Maxie saw Appellant Billy Ray Horton for the first time. Alton told Horton what had happened and Horton allowed him to make a telephone call. He said Horton told him to tell whoever he called that they could not get out of jail until the following morning. Alton stated that Horton held his hand on the phone while the call was made to enable him to cut off the conversation if Alton said anything he should not. On cross-examination, Alton said that he did not see any blood on Ladner or Horton. He further testified that he had no knowledge of Appellant having a weapon, or laying a hand on, or doing anything to Garner.

Wilton Fair, the Grand Jury Foreman, who was called for the purpose of establishing that reasonable diligence was used to determine what the murder weapon was, testified that Dr. V.V. Gonzales told the Grand Jury the weapon that had caused Garner's death was not a flashlight, and the Grand Jury determined a flashlight was not the murder weapon.

Melton Sangwin, Jr., an inmate from an adjoining jail cell, testified that the individuals in the detoxification tank were causing a disturbance by rattling the cell door and yelling. He testified about Ladner and Hyden going into the tank, and hearing three blows in the detox. tank, but he did not hear anything in the hallway.

Angus Bozeman, another inmate, testified that there was cursing going on between the individuals in the adjoining detox. tank and himself, about Ladner going into the tank and he heard "licks" being passed, and more "licks" when Garner was taken into the hallway. He heard Ladner from the book-in room say, "Bo, hand me a black-jack," and then tell someone, "Sit down, boy," and immediately thereafter it got quiet. He testified that sometime after this, Ladner came in and got his cell-mate, Trent Taylor, who was a trustee, to do some work for him. He related that when Taylor returned, he told him he had cleaned up some blood in the drunk tank. He testified on cross-examination that as far as he knew, Appellant Horton was not at the Sabine County Jail during this time, and after Ladner and Hyden went to the book-in room with Garner, he never heard anyone else go in there.

Trent Taylor, the trustee, testified that he heard Ladner say to Hyden, "Give me a black-jack." He testified about Ladner coming to get him and then taking him to get a mop and going to the detox. cell where he observed Garner who appeared to be passed out. He testified about cleaning up four or five spots of blood in the hallway. He did not see any blood in the inmate processing room. On cross-examination, he testified he never saw or heard the Appellant in the Sabine County Jail on December 25.

Roscoe Davis, a Texas Ranger who was called in to investigate the matter the next

morning, testified that he observed blood on the concrete wall in the book-in area and stated that it appeared Garner's head may have hit and slid down and bled in the area. On cross-examination, he stated he found no evidence that Garner was hit with a flashlight.

Appellant did not testify at trial; however, his testimony was offered through testimony given and recorded by a court reporter before the Smith County Grand Jury. This testimony revealed that he was in the dispatcher's office with Mary Russell, the dispatcher, when Hyden and Ladner took Garner to the book-in room. After a while they got loud and he walked in. He stated that after he walked in, Garner reached for a flashlight and he grabbed the flashlight from him and put it down; that Garner then slung Hyden loose in a scuffle with Ladner and Hyden, and Garner stumbled and fell back into the wall, hitting his head. After the scuffle with Garner, he went into the kitchen for a cup of coffee and then went back into the book-in room where he followed Ladner, Hyden, and Garner back to detox. He testified he never hit Garner, himself, and never saw anyone strike Garner in the book-in room. He testified he did not know what happened in the detox. tank.

Dr. Gonzales, the pathologist who performed the autopsy on Garner, testified there were no other injuries found besides those to his head. There was evidence of massive blows to the head and a small cut in the back of the head which had bled. He testified that a slap-jack leaves no external marks. He further testified that in his opinion Garner died of a subdural hemorrhage resulting from severe blows to the head, which was consistent with being struck with a slap-stick, and that whoever struck Garner on the head intended to cause serious bodily injury, and committed an act clearly dangerous to human life. He testified the type of injuries sustained by Garner would not have resulted in cranial fractures. On cross-examination, he stated that the small laceration on the back of the head which caused the bleeding would not have caused Garner's death.

Dr. R.J. Donaldson, who was the treating physician when Garner was brought to the hospital in Tyler, testified that the laceration at the back of the head was not severe enough to cause death and could have been received by falling back against a chair or wall. On cross-examination, he testified that the blow which caused the subdural hematoma did not necessarily render Garner immediately unconscious. After receiving the blow that ultimately caused his death, the doctor testified that it was possible that Garner may have been able to walk, talk, and function for some period of time.

In *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), the Supreme Court established the standard of reviewing evidence as, whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. However, the State convicted Appellant on circumstantial evidence and the standard of review we are required to apply when the conviction is based upon circumstantial evidence, in cases tried prior to November 6, 1991, is that the conviction cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the appellant. In other words, if the evidence supports a reasonable inference other than that of the appellant's guilt, a finding of guilt beyond a reasonable doubt is not rational. *Goff v. State*, 777 S.W.2d 418 (Tex.Cr.App.1989). The reasonable hypothesis test was abandoned in cases decided after November 6, 1991 by the Court of Criminal Appeals in *Geesa v. State*, 820 S.W.2d 154, 158–61 (Tex.Cr.App.1991), when they delivered a new definitive instruction on "reasonable doubt."

In the case at bar, Appellant was charged with the commission of murder as both a principal and/or as a party. The record is devoid of any evidence which would justify a finding that Appellant was guilty of the offense as a principal. Clearly, any culpability of Appellant would be only as a party, pursuant to Texas Penal Code Section 7.02(a)(2), (3). Where the evidence shows that Appellant was not the primary actor, but at most, responsible for the actions of the primary actor, the State must prove

conduct constituting an offense, plus an act by Appellant done with the intent to promote or assist such conduct. *Beier v. State,* 687 S.W.2d 2 (Tex.Cr.App.1985). Evidence is sufficient to support a conviction under the law of parties when the actor is present at the commission of the offense and encourages the commission of the offense either by words or other agreement. *Navarro v. State,* 776 S.W.2d 710 (Tex.App.—Corpus Christi 1989, pet. ref'd), *citing Burdine v. State,* 719 S.W.2d 309 (Tex.Cr.App.1986); *Cordova v. State,* 698 S.W.2d 107 (Tex.Cr. App.1985).

■ The agreement, if any, must be before or contemporaneous with the criminal event. Applying these standards, we look to the evidence to determine where Appellant was when the blows that caused the death were inflicted, and what act did Appellant do with the intent to promote or assist the lethal assault. It is undisputed that Thomas E. Ladner struck the victim with the slap-jack in the detox. cell and that Appellant was not present at the time. There was also evidence that blows were inflicted in the hallway from the detox. cell to the book-in room; however, there is no evidence that Appellant was present in the hallway. The only evidence of blows in book-in comes from Alton Maxie and Angus Bozeman, which was disputed. The pathologist testified there was evidence of three blows to the head, not including the small gash at the back of the head, which could not have been the cause of death.

The State's position at trial was that the fatal blows were inflicted in the book-in room. This is the only theory which would put the Appellant present during the offense. The State produced Grand Jury testimony of both Ladner and Horton. Both testified that Appellant entered the book-in room through closed doors from the dispatcher's office after he heard noise in the book-in room.

We hold that it is a reasonable hypothesis, based upon the record, that the fatal blows could have been inflicted either in the detox. tank or in the hallway before Appellant Billy Ray Horton was present. The State has failed to negate this hypothesis.

The State contends that Appellant was "lurking" around the jail on the fatal night and of him telling Alton Maxie to inform his mother they could not be released until morning. Appellant was a deputy sheriff in a small county and we can infer that it was Appellant's duty to help out in the jail when he was not on patrol. Besides Hyden, the only other member of the Sheriff's Department on duty that night was the female dispatcher. Appellant's instruction to Alton Maxie to tell his mother they could not be released until morning is consistent with the reasonable hypothesis that Horton was not a party to the murder, since we infer a judge would not be available to set their bonds until that time, and it would not be practical for their family to come all the way from Louisiana to discover that they could not yet be released.

Appellant was tried with Ladner and Hyden in a joint trial which was filled with the ugly overtones of white law enforcement officers taking advantage of their position and physical dominance to beat to death an intoxicated black man who had no prior criminal record and who had "brought on" the beating by demanding to be allowed to make a phone call. Appellant thus became tainted by the highly inflammatory evidence against Ladner and Hyden and the jury was unable to distinguish the difference between being in the jail at his duty post and acting in furtherance of the criminal activity of Ladner and Hyden. The State's evidence not only fails to connect Appellant to the fatal blows, but strongly suggests that Appellant's arrival in the book-in room caused Ladner and Hyden to stop beating Garner. For the reasons stated, we hold the evidence was insufficient to support Appellant's conviction of murder. Appellant's point of error number one is *sustained.*

Since our ruling on the first point of error is dispositive of this appeal, we will not address the remainder of Appellant's points of error.

The judgment of the trial court is reversed and a judgment of acquittal is ordered.