

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

December 29, 1998

The Honorable Toby Goodman
Chair, Committee on Juvenile Justice &
Family Issues
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-500

Re: Advertising for placement of child for adoption (RQ-1144)

Dear Representative Goodman:

As you know, in Texas only a licensed child-placing agency[1] or a parent, expectant parent, or legal guardian of a child may place a child for adoption, and only a licensed child-placing agency may act as an intermediary between a parent and a prospective adoptive parent. Section 162.025, Family Code, makes it an offense for any other person to perform such acts, as follows:

> (a) A person who is not the natural or adoptive parent of the child, the legal guardian of the child, or a child-placing agency licensed under Chapter 42, Human Resources Code, commits an offense if the person:
>
>> (1) serves as an intermediary between a prospective adoptive parent and an expectant parent or parent of a minor child to identify the parties to each other; or
>>
>> (2) places a child for adoption.
>
> (b) It is not an offense under this section if a professional provides legal or medical services to:
>
>> (1) a parent who identifies the prospective adoptive parent and places the child for adoption without the assistance of the professional; or

---

[1] A child-placing agency is defined in chapter 42, Human Resources Code, which regulates such agencies. A "child-placing agency" is "a person, including an organization, other than the natural parents or guardian of a child who plans for the placement of or places a child in a child-care facility, agency foster home, agency foster group home, or adoptive home." Human Res. Code § 42.002(12).

(2) a prospective adoptive parent who identifies a parent and receives placement of a child for adoption without the assistance of the professional.

(c) An offense under this section is a Class B misdemeanor.[2]

Nothing in section 162.025 prohibits, however, a parent and a prospective adoptive parent from identifying each other and arranging an adoption without the assistance of a licensed intermediary.

Section 25.09, Penal Code, makes it a crime for a person to advertise that the person will place, provide, or obtain a child for adoption.[3]  Only a licensed child-placing agency is expressly excepted from this prohibition, as follows:

(a) A person commits an offense if the person advertises in the public media that the person will place a child for adoption or will provide or obtain a child for adoption.

(b) This section does not apply to a licensed child-placing agency that is identified in the advertisement as a licensed child-placing agency.

(c) An offense under this section is a Class A misdemeanor unless the person has been convicted previously under this section, in which event the offense is a felony of the third degree.

(d) In this section:

(1) "Child" has the meaning assigned by Section 101.003, Family Code.[4]

---

[2]Fam. Code § 162.025.

[3]We do not consider whether this statute violates the free speech protections of the First Amendment of the United States Constitution or article I, section 8, of the Texas Constitution.

[4]Section 101.003, Family Code, defines "child" as "a person under 18 years of age who is not and has not been married or who has not had the disabilities of minority removed for general purposes."

> (2) "Public media" has the meaning assigned by Section 38.01.[5] The term also includes communications through the use of the Internet or another public computer network.[6]

You first ask whether section 25.09, Penal Code, prohibits a parent from advertising to place his or her child for adoption. On its face, section 25.09 applies to any person who advertises to place, provide, or obtain a child for adoption. We think that the words "place" or "provide" a child for adoption plainly include placing or providing one's own child for adoption. Section 25.09 has only one express exception from its application: a licensed child-placing agency. An express exception to a statute manifests a legislative intent that the statute should apply in all cases not excepted.[7] We conclude, therefore, that section 25.09 prohibits a parent from advertising to place his or her child for adoption.

You next ask whether section 25.09, Penal Code, prohibits a prospective adoptive parent from advertising that he or she wishes to adopt a child. Section 25.09 prohibits a person, other than a licensed child-placing agency, from advertising that the person "will place a child for adoption or will provide or obtain a child for adoption." The phrase "will . . . obtain a child for adoption" could plausibly be read to refer to a person who seeks to adopt a child. Parts of the statute's legislative history indicate that such a reading was intended. During a hearing on House Bill 1091 before the House Committee on Juvenile Justice and Family Issues, a witness asked you, as the bill's sponsor, whether the provision would prohibit prospective adoptive parents from advertising that they wished to adopt a child.[8] You stated repeatedly that the provision was intended to do so. You made reference to the committee's interim report, the impetus for House Bill 1091, which recommended legislation that would ban "baby wanted" advertising.[9]

On the other hand, the phrase "will . . . obtain a child for adoption" could also be read to refer to the act of acquiring a child for someone else to adopt. Other parts of the legislative history support this construction. The Juvenile Justice Committee's report on House Bill 1091 states: "The bill amends Penal Code Chapter 25, stating that a person commits an offense by advertising in the

---

[5]Section 38.01, Penal Code, defines "public media" as "a telephone directory or legal directory, newspaper or other periodical, billboard or other sign, radio or television broadcast, recorded message the public may access by dialing a telephone number, or a written communication not prohibited by Section 38.12(d) [prohibiting barratry]."

[6]Penal Code § 25.09 (footnotes added).

[7]*See Garcia v. State*, 829 S.W.2d 796, 798-99 (Tex. Crim. App. 1992); *State v. Richards*, 301 S.W.2d 597, 600 (Tex. 1957).

[8]Hearings on H.B. 1091 Before the House Comm. on Juvenile Justice & Family Issues, 75th Leg. (Mar. 26, 1997) (audio tape available from House Video/Audio Services).

[9]House Comm. on Juvenile Justice & Family Issues, Interim Report to the 75th Texas Legislature (Dec. 1996) at 8.

public media *that they will place a child in adoption, or provide a child for adoption.*"[10] And, in explaining House Bill 1091 on the floor of the House of Representatives, you stated that the bill "amends chapter 25 of the Penal Code creating an offense to advertise in the public media that *a child will be placed for adoption or provide a child for adoption.*"[11] Thus at least two explanations of the bill to the legislature omitted any reference to application of the prohibition to prospecfive adoptive parents. While the bill's sponsor may have contemplated a different construction, when interpreting a statute a court must seek to effectuate the "collective" intent of the legislators who enacted it.[12] In doing so a court normally focuses on the literal text of the statute, which in this case we think is susceptible to more than one understanding. In light of the ambiguity in both the wording of the statute and its legislative history, we cannot predict how a court would rule on this question. Moreover, we believe this ambiguity makes the statute susceptible to a challenge that it is unconstitutionally vague.

Criminal laws must give notice to the populace as to what activity is made criminal because lack of notice poses a trap for the innocent.[13] A criminal statute must be clear enough so that a person of ordinary intelligence is given reasonable notice of what conduct is prohibited.[14] It must also provide adequate standards to those who enforce it so that it cannot be arbitrarily and discriminatorily applied.[15] Furthermore, where the constitutional right to freedom of speech is implicated, as it is in this case, the law requires a greater degree of specificity than in other contexts.[16] We will not predict how a court would rule on this question. We note, however, that it is within the power of the legislature to avoid constitutional challenges by amending the statute to make clear its intended scope.

Your third question is whether a member of the public media commits an offense if it publishes an advertisement prohibited by section 25.09. You ask us to consider the application of Penal Code sections 7.01 and 7.02, known as the "law of parties," in answering this question. Section 7.01 makes a person criminally responsible as a party to an offense if the offense is committed by the person's own conduct or by the conduct of another for which the person is criminally responsible. We will assume that you are asking about a situation in which an

---

[10]House Comm. on Juvenile Justice & Family Issues, Bill Analysis, H.B. 1091, 75th Leg. (1997) (emphasis added).

[11]Debate on H.B. 1091 on the Floor of the House of Representatives, 75th Leg. (Apr. 29, 1997) (audio tape available from House Video/Audio Services) (emphasis added).

[12]*Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[13]*Acosta v. State*, 972 S.W.2d 95, 97 (Tex. App.--El Paso 1998, no pet.).

[14]*Long v. State*, 931 S.W.2d 285, 287 (Tex. Crim. App. 1996).

[15]*Acosta*, 972 S.W.2d at 98.

[16]*Long*, 931 S.W.2d at 287-88 (citing *Kramer v. Price*, 712 F.2d 174, 177 (5th Cir. 1983)).

advertisement publisher does not commit an offense under section 25.09 by its own conduct, since the publisher itself does not seek to place, provide, or obtain a child for adoption, but instead provides the means of advertising for someone else who wishes to do so. Thus we consider whether a publisher[17] can be criminally responsible for the conduct of another person who places an advertisement in violation of section 25.09.

Section 7.02 makes a person criminally responsible for an offense committed by another if:

> (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

> (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

Criminal responsibility under subsections (1), (2), and (3) of section 7.02 requires criminal intent.[18] To be convicted as a party to an offense, it must be shown that the accused knew he or she was assisting in the commission of the offense.[19] Thus a publisher does not commit an offense under section 25.09 if it merely publishes an advertisement without knowledge that the advertisement is unlawful and without intent to promote or assist in the commission of an offense. However, we cannot determine as a matter of law whether a publisher is criminally responsible for an unlawful advertisement, since whether a publisher possesses the requisite criminal intent will depend upon the facts of the particular case.

Finally, you ask whether section 25.09, Penal Code, or section 162.025, Family Code, prohibits a person outside of Texas from advertising or communicating by way of Internet transmissions reaching Texas that the person will serve as an intermediary to bring together a parent

---

[17]We use the term "publisher" to refer not only to a member of the print media, but to any member of the public media within the Penal Code's definition of public media. *See* Penal Code § 38.01(10) (defining "public media" as "a telephone directory or legal directory, newspaper or other periodical, billboard or other sign, radio or television broadcast, recorded message the public may access by dialing a telephone number, or a written communication not prohibited by Section 38.12(d) [prohibiting barratry]").

[18]*See Medrano v. State*, 612 S.W.2d 576, 578 (Tex. Crim. App. 1981); *Horton v. State*, 880 S.W.2d 22, 24-25 (Tex. App.--Tyler 1993, pet. ref'd).

[19]*See Amaya v. State*, 733 S.W.2d 168, 174-75 (Tex. Crim. App. 1986); *In re A.B.*, 868 S.W.2d 938, 941 (Tex. App.--Fort Worth 1994, no writ).

and a prospective adoptive parent. Penal Code section 1.04 gives Texas jurisdiction over criminal conduct if either "the conduct or a result that is an element" of the offense occurs inside the state. One court has explained:

> Section 1.04 combines subjective and objective territorial principles. Jurisdiction is conferred over offenses commenced within the state but completed outside the state (subjective) and for offenses commenced outside the state but consummated within (objective). The primary policy considerations underlying section 1.04 are that Texas should have a substantial interest in or connection with the criminal event it seeks to prosecute and that law enforcement should be facilitated by plugging gaps in existing law when a course of conduct goes beyond the boundaries of a single state.[20]

The application of these principles to conduct that occurs via the Internet has not yet, as far as we know, been tested by any Texas court. The Internet is a conglomeration of technology and modes of communication that we will not attempt to fully explain in this opinion.[21] We think it is well known, however, that Internet communications have the capacity to cross state boundaries, even international boundaries, in an instant. Information that is created in one location may be sent to or viewed by persons in any location worldwide. Depending upon the mode of communication, the creator of Internet information may have no control over who views the information or where it is viewed. For example, if an advertisement is posted on a web page, the page may be viewed by anyone who accesses that page from any location accessible to the Internet. On the other hand, a communication might be sent to a particular person, by way of electronic mail, for example, with the advertiser having full knowledge of the identity and location of the intended recipient. The possible scenarios under which a person might advertise or communicate by way of the Internet that the person will serve as an intermediary to bring together a parent and a prospective adoptive parent are limitless. The facts of each case will have to be examined in an attempt to determine where the criminal event occurred when the events are taking place in "cyberspace." We cannot, therefore, determine as a matter of law whether Internet advertisements or communications initiated outside of Texas, but received within the state, are within the reach of Texas law pursuant to the authority of Penal Code section 1.04.

A more fundamental concern raised by your question, however, is whether the application of these statutes to the Internet passes constitutional muster. State laws that criminalize certain Internet communications without regard to where the communications were initiated are subject to

---

[20]*McGowan v. State*, 938 S.W.2d 732, 734-35 (Tex. App.--Houston [14th Dist.] 1996, pet. granted) (citations omitted).

[21]For in-depth discussions of the Internet and the emerging law regarding state jurisdiction over conduct on the Internet, we recommend the following cases and publications: *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997); *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997); H. Joseph Hameline & William Miles, *The Dormant Commerce Clause Meets the Internet*, 41-Oct. B.B.J. 8 (1997).

challenge on the ground that they violate the Commerce Clause of the United States Constitution.[22] The Commerce Clause empowers Congress to regulate interstate commerce and restricts the states' power to enact laws that interfere with interstate commerce.[23] It also prohibits states from regulating an aspect of interstate commerce that is of such national interest that it demands uniform national treatment, thereby making it solely within the power of Congress to regulate.[24]

In *American Libraries Ass'n v. Pataki*,[25] a federal district court found unconstitutional a New York law making it a crime to use a communications system to transfer sexually explicit materials to minors. The court examined the nature of the Internet and efforts by states to regulate Internet conduct and found that such regulation implicates the Commerce Clause. The court explained:

> The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed. Typically, states' jurisdictional limits are related to geography; geography, however, is a virtually meaningless construct on the Internet. The menace of inconsistent state regulation invites analysis under the Commerce Clause of the Constitution, because that clause represented the framers' reaction to overreaching by the individual states that might jeopardize the growth of the nation–and in particular, the national infrastructure of communications and trade–as a whole.[26]

The court then examined the New York law, which applied to any communication, whether intrastate or interstate, over which New York had the capacity to exercise criminal jurisdiction. The court held that the law violated the Commerce Clause, stating:

> [T]he New York Act is concerned with interstate commerce and contravenes the Commerce Clause for three reasons. First, the Act represents an unconstitutional projection of New York law into conduct that occurs wholly outside New York. Second, the Act is invalid because although protecting children from indecent material is a legitimate and indisputably worthy subject of state legislation, the burdens on interstate commerce resulting from

---

[22]Article I, section 8, clause 3 of the United States Constitution provides: "The Congress shall have Power . . . to regulate Commerce . . . among the several States . . . ."

[23]*See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 236-37 (1824).

[24]*See Southern Pac. Co. v. Arizona*, 325 U.S. 761 (1945) (holding that state may not regulate railroad train lengths).

[25]969 F. Supp. 160 (S.D.N.Y. 1997).

[26]*Id.* at 168-69.

the Act clearly exceed any local benefit derived from it. Finally, the Internet is one of those areas of commerce that must be marked off as a national preserve to protect users from inconsistent legislation that, taken to its most extreme, could paralyze development of the Internet altogether. Thus, the Commerce Clause ordains that only Congress can legislate in this area, subject, of course, to whatever limitations other provisions of the Constitution (such as the First Amendment) may require.[27]

Penal Code section 25.09, prohibiting adoption advertising, on its face applies to "communications through the use of the Internet or another public computer network."[28]  And, through the application of Penal Code section 1.04, a Texas prosecutor could seek to apply Family Code section 162.025, prohibiting unlicensed adoption intermediations, to Internet conduct. We think that a court would consider the *American Libraries v. Pataki* case in determining whether the application of section 25.09, Penal Code, or section 162.025, Family Code, to Internet communications is constitutional. However, no Texas court or federal court with jurisdiction over Texas has yet considered the constitutionality of state regulation of Internet communications, and we cannot predict how such a court would rule. We can only advise you that this is an issue that might arise in the prosecution of an offense committed by the use of Internet communications.

---

[27]*Id.* at 169.

[28]*See* Penal Code § 25.09(d)(2).

## S U M M A R Y

Section 25.09, Penal Code, prohibits any person other than a licensed child-placing agency from advertising to place, provide, or obtain a child for adoption. Whether a publisher of an advertisement prohibited by section 25.09 is criminally responsible for the conduct of the advertiser depends upon the facts of the particular case. Whether Texas courts may exercise criminal jurisdiction over unlawful Internet advertisements or communications initiated outside of Texas, but received within the state, also depends upon the facts of the particular case. No Texas court or federal court with jurisdiction over Texas has addressed this issue.

Very truly yours,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Barbara Griffin
Assistant Attorney General